Case Nos. 13-1226, 13-1244

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

TELLABS OPERATIONS, INC.,

Plaintiff-Appellant,

and

TELLABS, INC., and
TELLABS NORTH AMERICA, INC.,

Counterclaim Defendants-
Appellants,

v.

FUJITSU LIMITED,

Defendant-Cross-Appellant,

and

FUJITSU NETWORK COMMUNICATIONS, INC.,

Defendant.

Appeals from the United States District Court
for the Northern District of Illinois in case No. 08-CV-3379,
Judge James F. Holderman, Jr.

## OPENING BRIEF OF APPELLANTS TELLABS OPERATIONS, INC., TELLABS, INC., AND TELLABS NORTH AMERICA, INC.

James P. Bradley
Mark A. Dodd
Kristoffer B. Leftwich
Kelley A. Conaty
Benjamin B. Kelly
**SIDLEY AUSTIN LLP**
717 North Harwood, Ste. 3400
Dallas, Texas 75201
Telephone: 214.981.3300

Constantine L. Trela, Jr.
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone: 312.853.7000

Attorneys for Tellabs Operations, Inc.,
Tellabs, Inc., and Tellabs North America, Inc.

Case Nos. 13-1226, 13-1244

**CERTIFICATE OF INTEREST**

The undersigned counsel of record certifies the following:

1. The full name of the party or *amicus curiae* represented by me is:

   Tellabs Operations, Inc., Tellabs, Inc., and Tellabs North America, Inc.

2. The name of the real party in interest (if the parties named in the caption are not the real parties in interest) represented by me is:

   Same as stated in paragraph 1.

3. All parent corporations and publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

   Tellabs, Inc. is the parent corporation of Tellabs Operations, Inc. and Tellabs North America, Inc. and is a publicly traded corporation that owns more than 10% of both Tellabs Operations, Inc. and Tellabs North America, Inc.

4. The names of all law firms and the partners or associates that appeared for the party or *amicus curiae* now represented by me in the trial court or agency or are expected to appear in this Court are:


David T. Pritikin
Richard A. Cederoth
Richard O'Malley, Jr.
Robert Leighton
Constantine L. Trela, Jr.
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603

James P. Bradley
Steven C. Malin
Mark A. Dodd
Kristoffer B. Leftwich
Kelley A. Conaty
Benjamin B. Kelly
Vijay D. Desai
**SIDLEY AUSTIN LLP**
717 North Harwood, Suite 3400
Dallas, Texas 75201

i

Dated: June 10, 2013

Respectfully submitted,

/s/ Constantine L. Trela, Jr.

Constantine L. Trela, Jr.
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

*Attorney for Tellabs Operations, Inc.,*
*Tellabs, Inc., and Tellabs North*
*America, Inc.*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ........................................................ viii

JURISDICTIONAL STATEMENT ........................................................... 1

QUESTIONS PRESENTED ...................................................................... 1

STATEMENT OF THE CASE .................................................................. 2

I.     PRELIMINARY STATEMENT. ................................................... 2

II.    COURSE OF PROCEEDINGS AND THE DISPOSITION BELOW ................................ 6

STATEMENT OF FACTS ........................................................................ 7

I.     THE TECHNOLOGY AT ISSUE. ............................................... 7

     A.    AUTOMATIC GAIN CONTROL. ........................................... 10

     B.    AUTOMATIC LEVEL CONTROL. ......................................... 11

     C.    GAIN-FLATTENING FILTERS. ............................................ 12

II.    THE '681 PATENT. .................................................................. 13

     A.    THE ASSERTED CLAIMS. ................................................... 13

     B.    CLAIM CONSTRUCTION. .................................................... 15

III.   THE PRIOR ART. .................................................................... 17

     A.    U.S. PATENT NO. 6,055,092. ............................................ 17

     B.    THE JULY 1995 SUGAYA ARTICLE. .................................. 19

     C.    U.S. PATENT NO. 5,083,874. ............................................ 20

SUMMARY OF THE ARGUMENT ........................................................ 21

ARGUMENT ............................................................................................. 23

I.     STANDARD OF REVIEW. ........................................................ 23

II.    THE DISTRICT COURT ERRED BY DENYING JUDGMENT AS A MATTER OF LAW THAT THE '681 PATENT IS INVALID AS ANTICIPATED BY THE '092 PATENT. ........................................................................ 24

     A.    CLAIM 6 IS ANTICIPATED BY THE '092 PATENT. ............... 27

          1.    The '092 Patent Discloses an Amplifier That Amplifies an Optical Signal Inherently "Having a Variable Number of Channels Associated with Different Wavelengths" and Includes a Controller that "Controls the Gain to be Approximately Constant." ......... 27

               a)    An "Amplifier Which Amplifies a Wavelength Division Multiplexed (WDM) Optical Signal . . . With a Gain." ................. 28

               b)    An Amplifier that Amplifies a WDM Optical Signal Having Channels "Associated With Different Wavelengths." .......................... 28

        c)      An Amplifier that Amplifies a WDM Optical Signal "Having a Variable Number of Channels." ................................. 29

        d)      An Amplifier that Includes "a Controller Which Controls the Gain to be Approximately Constant." ................................... 33

   2.     All Remaining Elements of Claim 6 are Disclosed by the '092 Patent. ................................................................................. 35

  B.   CLAIM 7 IS ANTICIPATED BY THE '092 PATENT. ................................. 39

  C.   CLAIM 8 IS ANTICIPATED BY THE '092 PATENT. ................................. 41

III.   THE DISTRICT COURT ERRED BY DENYING JUDGMENT AS A MATTER OF LAW THAT THE '681 PATENT IS INVALID AS OBVIOUS UNDER 35 U.S.C. § 103 IN VIEW OF THE JULY 1995 SUGAYA ARTICLE IN COMBINATION WITH THE '874 PATENT. ............................................... 42

  A.   CLAIM 6 IS OBVIOUS IN VIEW OF THE JULY 1995 SUGAYA ARTICLE AND THE '874 PATENT. ........................................................................ 43

   1.     The July 1995 Sugaya Article Discloses an Amplifier that Amplifies an Optical Signal "Having a Variable Number of Channels Associated with Different Wavelengths" and Includes a Controller that "Controls the Gain to Be Approximately Constant." ....... 43

        a)      An "Amplifier Which Amplifies a Wavelength Division Multiplexed (WDM) Optical Signal . . . With a Gain." ................ 44

        b)      An Amplifier that Amplifies a WDM Optical Signal Having Channels "Associated With Different Wavelengths." ............................................................. 45

        c)      An Amplifier that Amplifies a WDM Optical Signal "Having a Variable Number of Channels." ................................. 45

        d)      An Amplifier that Includes "a Controller Which Controls the Gain to be Approximately Constant." ................................... 48

   2.     All Remaining Elements of Claim 6 are Disclosed by the July 1995 Sugaya Article, In Combination with the '874 Patent. ............................ 49

   3.     One of Ordinary Skill in the Art Would Have Been Motivated to Combine the Teachings of the July 1995 Sugaya Article with those of the '874 Patent. ................................................................. 53

   4.     Combining the July 1995 Sugaya Article with the '874 Patent Would Have Produced Predictable Results. ............................................. 54

   5.     Fujitsu Presented No Evidence of Secondary Considerations. ................. 55

  B.   CLAIM 7 IS OBVIOUS IN VIEW OF THE JULY 1995 SUGAYA ARTICLE AND THE '874 PATENT. ........................................................................ 57

  C.   CLAIM 8 IS OBVIOUS IN VIEW OF THE JULY 1995 SUGAYA ARTICLE AND THE '874 PATENT. ........................................................................ 58

IV.    FUJITSU IMPROPERLY IMPORTED THE ATTENUATOR FREEZING FEATURE FROM THE '681 PATENT'S SPECIFICATION INTO THE GAIN CONTROL FUNCTION RECITED IN THE CLAIMS. .................................................. 59

    A.    THE CLAIMS OF THE '681 PATENT DO NOT REQUIRE OR INCLUDE FREEZING THE OPTICAL ATTENUATOR AS PART OF THE RECITED GAIN CONTROL FUNCTION. ...................................................................................................... 59

    B.    FUJITSU IMPROPERLY DISTINGUISHED THE PRIOR ART BASED ON THE FACT THAT THE PRIOR ART DID NOT FREEZE THE OPTICAL ATTENUATOR WHEN THE NUMBER OF CHANNELS CHANGED ................................................... 61

    C.    THE DISTRICT COURT ERRED BY DENYING JUDGMENT AS A MATTER OF LAW BASED ON FUJITSU'S IMPROPER ARGUMENTS. ............................................. 66

CONCLUSION ................................................................................................................... 67

# TABLE OF AUTHORITIES

**CASES**

*Allen Eng'g Corp. v. Bartell Indus., Inc.*
299 F.3d 1336 (Fed. Cir. 2002) ............................................... 61

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*
150 F.3d 1354 (Fed. Cir. 1998) ............................................... 24

*Chef Am., Inc. v. Lamb-Weston, Inc.*
358 F.3d 1371 (Fed. Cir. 2004) ............................................... 61

*Clarett v. Roberts*
657 F.3d 664 (7th Cir. 2011) ............................................... 23

*Finisar Corp. v. DirecTV Group, Inc.*
523 F.3d 1323 (Fed. Cir. 2008) ............................................... 24

*Graham v. John Deere Co.*
383 U.S. 1 (1966) ............................................... 42, 55

*Juicy Whip, Inc. v. Orange Bang, Inc.*
292 F.3d 728 (Fed. Cir. 2002) ............................................... 23

*KSR Int'l Co. v. Teleflex Inc.*
550 U.S. 398 (2007) ............................................... 42, 54, 55

*In re Kubin*
561 F.3d 1351 (Fed. Cir. 2009) ............................................... 24

*May v. Chrysler Group, LLC*
692 F.3d 734 (7th Cir. 2012) ............................................... 23

*MEHL/Biophile Intern. Corp. v. Milgraum*
192 F.3d 1362 (Fed. Cir. 1999) ............................................... 32

*Millbrook v. IBP, Inc.*
280 F.3d 1169 (7th Cir. 2002) ............................................... 24

*New Idea Farm Equip. Corp. v. Sperry Corp.*
916 F.2d 1561 (Fed. Cir. 1990) ............................................... 24

*In re Pearson*
494 F.2d 1399 (C.C.P.A. 1974) ............................................... 22, 65, 66

*Perricone v. Medicis Pharm. Corp.*
432 F.3d 1368 (Fed. Cir. 2005) ............................................... 32

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............................................... 61

*Reeves v. Sanderson Plumbing Prods., Inc.*
530 U.S. 133 (2000) ............................................... 23

*In re Schreiber*
128 F.3d 1473 (Fed. Cir. 1997) ............................................... 65, 66

*In re Sinex*
309 F.2d 488 (C.C.P.A. 1962)                                    65, 66

*Thomas v. Cook Cnty. Sheriff's Dep't*
604 F.3d 293 (7th Cir. 2009)                                        23

*W. Union Co. v. MoneyGram Payment Sys., Inc.*
626 F.3d 1361 (Fed. Cir. 2010)                                      24

*White v. Dunbar*
119 U.S. 47 (1886)                                                  61

*WMS Gaming, Inc. v. Intl. Game Tech.*
184 F.3d 1339 (Fed. Cir. 1999)                                      56

*z4 Techs., Inc. v. Microsoft Corp.*
507 F.3d 1340 (Fed. Cir. 2007)                                      24

**STATUTES**

28 U.S.C. § 1295 ......................................................................... 1

28 U.S.C. § 1331 ......................................................................... 1

28 U.S.C. § 1338 ......................................................................... 1

35 U.S.C. § 102 ................................................................... 18, 24

35 U.S.C. § 103 ....................................................................... 42

**RULES**

Fed. R. Civ. P. 50 ..................................................................... 23

## STATEMENT OF RELATED CASES

No prior appeal in or from the same civil action was previously before this or any other appellate court.  Related cases are currently pending in the Northern District of Illinois, *Fujitsu Ltd. v. Tellabs Operations, Inc., et al*., Civil Action No. 1:09-cv-04530, and *Fujitsu Ltd. v. Tellabs Operations, Inc., et al*., Civil Action No. 1:12-cv-03229.

In Case No. 1:09-cv-04530, Fujitsu Limited asserts that Tellabs Operations, Inc., Tellabs, Inc., and Tellabs North America, Inc. infringe U.S. Patent Nos. 5,521,737, 5,526,163, and 5,386,418.  The district court found the '418 patent to be invalid on September 26, 2012.  Fujitsu appealed that decision to this Court (Case No. 2013-1052); the appeal was voluntarily dismissed on March 26, 2013.  The district court case is currently pending with respect to the '737 and '163 patents.

In Case No. 1:12-cv-03229, Fujitsu asserts that Tellabs Operations, Inc., Tellabs, Inc., and Tellabs North America, Inc. infringe U.S. Patent Nos. 5,521,737, 5,526,163, 5,386,418, and 7,227,681.[1]  The Tellabs defendants filed a counterclaim asserting that, among other things, Fujitsu and Fujitsu Communication Networks, Inc. infringe two Tellabs patents, U.S. Patent Nos. 6,285,480 and 7,103,063.  The resolution of the present appeal may affect this case with respect to the '681 patent.

---

[1] The '681 patent is the patent at issue in this appeal.

Counsel for Tellabs Operations, Inc., Tellabs, Inc., and Tellabs North America, Inc. are not aware of any other cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338. Final judgment was entered on January 24, 2013. (A1-A19A.) Tellabs Operations, Inc., Tellabs, Inc., and Tellabs North America, Inc. (collectively "Tellabs") filed their notice of appeal on February 22, 2013. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## QUESTIONS PRESENTED

1.      Did the district court err by denying judgment as a matter of law that the asserted claims of the '681 patent were anticipated by U.S. Patent No. 6,055,092 ("the '092 patent") because it concluded that the evidence was sufficient to allow the jury to find that the '092 patent does not disclose an optical amplifier that (a) amplifies an optical signal inherently "having a variable number of channels associated with different wavelengths" and (b) includes a controller that "controls the gain to be approximately constant"?

2.      Did the district court err by denying judgment as a matter of law that the asserted claims of the '681 patent were obvious in light of the combination of the July 1995 Sugaya Article and U.S. Patent No. 5,083,874 ("the '874 patent") because it concluded that the evidence was sufficient to allow the jury to find that the July 1995 Sugaya Article does not disclose an optical amplifier that (a)

1

amplifies an optical signal expressly or inherently "having a variable number of channels associated with different wavelengths" and (b) includes a controller that "controls the gain to be approximately constant"?

## STATEMENT OF THE CASE

### I. Preliminary Statement.

This case relates to fiber optic communication systems that use wavelength division multiplexing ("WDM") to transmit multiple channels of information along an optical fiber. (A2.) In such systems, optical amplifiers are used to amplify the power of the optical signal to allow the signal to travel long distances. (A2.) The amount of amplification, or "gain," needed varies with the number of channels, and the gain received by each channel varies depending on wavelength. (A2-3.)

A challenge such systems face is that when the number of channels changes, the power per channel in the amplified WDM signal can vary, which causes degradation of the optical signal. (A336(2:10-17).) This occurs because such systems typically include an optical attenuator – *i.e.*, a device that attenuates an optical signal (A15404(3:64-4:20); A15405(6:33-35) (attenuators cause attenuation in an optical signal)) – that is controlled to maintain the amplified WDM optical signal output from the amplifier at a predetermined power level. (A338(6:15-25).) For example, when channels are added to an incoming WDM optical signal, the total power of the amplified WDM optical signal increases. To maintain the total

2

power of the amplified WDM optical signal at a constant level, the attenuator must react by increasing attenuation and reducing the power level of the amplified signal. Because the amplified WDM signal now includes more channels but the total power has been kept constant, the power per channel in the amplified WDM signal has been reduced. (*See* A338(6:31-42).)

The specification of the '681 patent describes a system that keeps the power per channel constant by causing the light transmissivity of the optical attenuator to be kept constant – which the patent describes as "freez[ing]" the operation of the attenuator – when a monitor signal indicates a change in the number of channels. (A339(7:55-8:31); A334 (Fig. 28 shows optical power per channel held constant by freezing the state of the optical attenuator); *see also* A336(1:35-39); A337(3:11-31).)

The claims of the '681 patent are not specifically directed to this invention. Instead, the '681 patent claims an optical amplifier apparatus that provides constant gain to a WDM optical signal and includes an optical attenuator that merely "controls a level of the amplified WDM optical signal." (*See, e.g.*, A346(claim 6).) The claims of the '681 patent do not recite an optical attenuator that "freezes" to maintain constant power per channel when the number of channels in a WDM optical signal changes. Without this additional limitation, the invention claimed in the '681 patent does not maintain constant power per channel

when the number of channels changes, and the claims of the '681 patent simply read on the prior art.

Despite this, the district court denied judgment as a matter of law because it determined that the evidence was sufficient to allow the jury to conclude that the prior art does not disclose an optical amplifier that amplifies an optical signal "having a variable number of channels associated with different wavelengths" and includes a controller that "controls the gain to be approximately constant," as required by the asserted claims. (A14, A18.) That determination was wrong because the evidence Fujitsu presented, on which the district court relied, relates solely to the "frozen" attenuator described in the specification, but not claimed in the '681 patent.

Figures 2 and 3 of the '681 patent (reproduced below) present a comparison of the prior art and the invention described in, but not claimed by, the '681 patent. (A308-09.) As admitted by inventor Yasushi Sugaya, the *only* differences between the prior art of Figure 2 and the invention of Figure 3 are Figure 3's monitor signal processing circuit 70 and photodiode $58_4$ (shown highlighted in yellow), the components that cause the attenuator in the specification to "freeze" when the number of channels varies. (A16887-89(643:7-645:1); A339(7:36-8:31).) Neither of these elements is recited in the claims of the '681 patent, and Fujitsu's expert Dr. Willner and inventor Sugaya maintained at trial that the invention claimed by

4

the '681 patent does not require a monitor signal processing circuit. (*See, e.g.,*

A16676(433:18-21); A16799-800(555:24-556:12); A16816(572:7-9, 572:16-18);

A17536-537(1288:9-14, 1288:22-1289:10); A17560(1312:5-12).) The claims of

the '681 patent, therefore, recite only elements commonly found in the prior art, as

shown in Figure 2.



(A308-09 (highlighting added).)

At trial and in response to Tellabs' motion for judgment as a matter of law,

Fujitsu relied on these unclaimed aspects of the system described in the '681 patent

to distinguish its claims from the prior art. Fujitsu argued that the prior art systems

would not hold gain constant in a variable channel count environment because the

prior art amplification systems did not freeze the attenuator when the number of

channels changed. (*See, e.g.*, A17852-53.) But the attenuator freezing feature

described in the specification is different than the gain control function recited in

the claims.

When the *unclaimed* features described in the specification are ignored, as they should be, it is clear that the prior art discloses the *claimed* invention. In particular, the prior art discloses optical amplifiers that amplify a WDM optical signal and employ (1) an automatic gain control ("AGC") circuit to maintain constant gain, (2) an automatic level control ("ALC") circuit to control an optical attenuator that controls a level of the amplified WDM optical signal, and (3) an optical filter that makes the gain substantially even across different channel wavelengths. Every element of the asserted claims is present in the prior art optical amplifiers, and those prior art amplifiers are inherently capable of amplifying an optical signal with constant gain in a variable channel count environment. The judgment should therefore be reversed.

## II.    Course of Proceedings and the Disposition Below.

This action began on June 11, 2008, when Tellabs filed suit alleging that Fujitsu Limited and Fujitsu Network Communications, Inc. infringed Tellabs' U.S. Patent No. 7,369,772 ("the '772 patent"). (A348-67.) Fujitsu thereafter filed a counterclaim alleging that Tellabs infringed two Fujitsu patents, U.S. Patent Nos. 7,227,681 ("the '681 patent") and 5,533,006 ("the '006 patent"). (A378-446.)

On March 11, 2011, the district court entered summary judgment that Fujitsu's '006 patent was invalid for indefiniteness (A18849-85), leaving only Tellabs' '772 patent and Fujitsu's '681 patent. Fujitsu's claims that Tellabs

infringed the '681 patent and Tellabs' claims that the '681 patent was invalid were tried to a jury beginning on August 27, 2012. At trial, Fujitsu asserted that Tellabs' Metro Input Amplifier Module ("MIAM") optical amplifier product infringed claims 6-8 of the '681 patent. Tellabs argued that each of these claims was invalid as anticipated and obvious in view of the prior art.

On September 7, 2012, the jury determined that the '681 patent was not invalid and not infringed. (A16241-42.) Both parties filed renewed JMOL motions, and the court denied both motions on January 24, 2013. (A1-19A.) On February 19, 2013, the district court granted Tellabs' motion to dismiss with prejudice its claims of infringement of the '772 patent and to dismiss without prejudice Fujitsu's counterclaims seeking declarations of invalidity as to that patent. (A18886-88.) This order disposed of all remaining claims in the litigation. On February 22, 2013, Tellabs filed its notice of appeal, and Fujitsu filed its notice of cross-appeal on March 8, 2013.

## STATEMENT OF FACTS

### I.     The Technology at Issue.

Fiber optic communication systems use fiber optic cable to transmit data from a source to a destination in the form of beams of light. (A336(1:41-43).) To transmit large amounts of data at one time, multiple channels or carriers of different wavelengths are combined into a single optical signal in a process known

as wavelength division multiplexing ("WDM").  (A336(1:60-65).)  To make

transmission possible over long distances, fiber optic systems use optical

amplifiers to increase the power level of the transmitted signals as they travel from

node to node in the network.  (A11335.)

Optical amplification systems employ a light amplifying material, such as a

rare-earth-element doped optical fiber, to increase the power of a WDM optical

signal.  (A15403(1:22-27); A15405(5:34-40).)  An erbium-doped ("Er-doped")

optical fiber is one example of a rare-earth-element doped optical fiber that can be

used to amplify light.  (A15405(6:58-61).)

Erbium-doped fiber amplifiers use a laser to supply a pump light beam,

which is coupled to the WDM optical data signal.  The combined optical signal

travels through an Er-doped fiber, where the pump light beam energizes the fiber

to produce "gain" for the data signal.  (A11336.)  Gain is a measure of the amount

of additional power an optical amplifier provides to an optical signal.  (A15205.)

In effect, the Er-doped fiber transfers the power of the pump light beam to the data

signal and thereby amplifies that signal — *i.e.*, produces gain — giving the data

signal more power than it had at the input.  (A11336.)  As the WDM optical data

signal travels through the Er-doped fiber, each channel within the WDM optical

signal receives gain, thus increasing the signal's power.  (*See* A15405(6:65-67).)

The ability to operate optical amplifiers at higher gain levels is desirable
because higher gain means that the optical signal will have more power to counter
the losses suffered as the signal propagates over a long distance. Higher gain
levels permit greater distances between amplifiers. (A17229-31(983:7-985:11).)
The ability to move amplifiers further apart reduces costs. (*Id.*)

The amplifier gain, however, is both wavelength and input-power
dependent. (A15403(1:32-35); A15405-06(6:55-7:22) (referring to Fig. 2 at
A15389); A15344(12:43-56).) Typically, longer wavelengths will receive more
gain and shorter wavelengths receive less, thereby causing the gain between
wavelengths to be uneven. (*See, e.g.,* A15405-06(6:55-7:22); A15353(Fig. 1);
A15359-62; A15344(12:43-56).) The power of the optical signal will also vary as
channels are added to or dropped from the optical signal. (A15361(Fig. 2);
A16902(658:10-16, 658:22-25); A17180-81(934:19-935:13).) When a channel is
added to a WDM optical signal, the output power from the optical amplifier for
each existing channel decreases as some of the power goes to amplify the added
channel. Likewise, when a channel is dropped from a WDM optical signal, the
output power from the optical amplifier for each remaining channel increases
because power is no longer needed to amplify the dropped channel. (*Id.*)

The wavelength and power dependence of the gain causes the signal-to-
noise ratio with respect to a particular signal to deteriorate. (A15403(1:35-40);

A15344(12:50-56).)  Ideally, the gain provided by the amplifier is equalized or

balanced when amplifying an optical signal with varying input power and various

channel wavelengths.  (A15403(1:15-21); A15344(12:43-64).)  Accordingly,

optical amplification systems using Er-doped fibers often include loss elements,

such as filters, to equalize the gain provided by the Er-doped fiber across multiple

wavelengths.  (A15344(12:43-64); A15205.)  The purported invention claimed by

the '681 patent relates to an apparatus that includes an optical attenuator that

controls the power level of the amplified WDM signal, an optical filter that makes

the gain substantially even with respect to wavelengths, and a controller that

controls the gain to be approximately constant.  (*See, e.g.,* A346(claim 6).)

### A.    Automatic Gain Control.

As explained in the prior art '092 patent, an automatic gain control ("AGC")

circuit controls a pump source, typically a semiconductor laser, used to excite a

gain medium, typically an Er-doped fiber.  (A15403(1:63-2:7).)  The '092 patent

explains that the AGC circuit controls the pump source so that "the ratio of the

light input power level detected by the light input monitor and the light output

power level detected by the light output monitor can be maintained at a constant

value."  (A15405(5:40-45).)  Or, as simply stated by Fujitsu's expert Dr. Willner,

an AGC circuit "maintain[s] constant gain across the erbium-doped fiber."

(A16650(407:23-25).)  An AGC circuit, therefore, is a known prior art controller that controls the gain to be approximately constant.

### B.    Automatic Level Control.

An attenuator is a known prior art device used to reduce the power level of an optical signal passing through it.  (A15404(3:64-4:20); A15405(6:33-35) (attenuators cause attenuation of an optical signal).)  "Transmissivity" is the ratio of the power transmitted from the optical attenuator to the power received by the optical attenuator.  (A11366.)  As explained by the district court in its claim construction opinion, "[a]n optical attenuator can have either a variable or a fixed (i.e., constant) transmissivity.  A 'variable optical attenuator' refers to an optical attenuator with a variable transmissivity.  The transmissivity of a 'fixed optical attenuator,' on the other hand, cannot change."  (A11367 (internal citations omitted).)  The attenuator of the '681 patent is "a device having variable optical transmissivity."  (A11366.)

A variable optical attenuator applies a variable amount of attenuation to control the power level of an optical signal.  (A15405(6:33-37); *see also* A11366-72.)  This allows the light output power to be maintained at a constant level notwithstanding changes in input power.  (A15405(6:33-37).)  As explained by the prior art '092 patent and Fujitsu's Dr. Willner at trial, a variable optical attenuator is controlled by an automatic level control circuit to vary the amount of attenuation

applied to an optical signal, including a WDM optical signal.  (A15405(5:16-30, 6:26-40).)  The use of an ALC circuit to control an attenuator that is acting to control the output level of an amplified WDM optical signal thus was known in the prior art.

## C.    Gain-Flattening Filters.

As noted above, Er-doped fiber amplifiers will provide a high gain to each channel in the optical signal, but that gain can be uneven based on the difference in wavelengths between individual channels.  At typical input power levels, longer wavelengths receive more gain, and shorter wavelengths receive less.  (*See, e.g.,* A15405-06(6:55-7:22) (referencing Fig. 2 at A15389); A15353(Fig. 1); A15359-62; A15344(12:43-56).)  This problem was recognized in the prior art as "gain tilt."  (*See* A15405-06(6:55-7:22) (referencing Fig. 2 at A15389); A15407(9:47-53); A15344(12:43-64); A15355-61.)

One solution to this problem of gain tilt, known to a person of skill in the art at the time of the claimed invention, is the use of an optical filter to make the gain even or flat with respect to wavelength.  (A15407(9:47-53); A15344(12:43-64); A17229-31(983:7-985:11).)  This is achieved by designing the filter to pass less light at certain wavelengths than at others, thereby attenuating the stronger channels that receive the most gain.  (A15344(12:50-64).)

## II.   The '681 Patent.

### A.   The Asserted Claims.

The '681 patent is titled "Controller Which Controls a Variable Optical Attenuator to Control the Power Level of a Wavelength-Multiplexed Optical Signal When the Number of Channels are Varied." (A305.) The patent is assigned to Fujitsu, and Yasushi Sugaya and Susumu Kinoshita are the named inventors. (*Id.*) The district court determined the priority date for the '681 patent to be April 28, 1997. (A18753-54.)

The asserted claims of the '681 patent, claims 6-8, claim an optical amplification system:

> 6. An apparatus comprising: an optical amplifier which amplifies a wavelength division multiplexed (WDM) optical signal *having a variable number of channels associated with different wavelengths* with a gain and outputs the amplified WDM optical signal, the optical amplifier including:
>> an optical attenuator which controls a level of the amplified WDM optical signal,
>> an optical filter making the gain substantially even with respect to said different wavelengths, and
>> a controller which *controls the gain to be approximately constant*.
>
> 7. An apparatus as in claim 6, wherein the controller controls the gain to be approximately constant during variation of the number of channels in the WDM optical [signal].
>
> 8. An apparatus as in claim 6, wherein an attenuation level of the optical attenuator is changed to control the level of the amplified WDM optical signal.

(A346(22:35-52) (emphasis added).)

13

As noted above, the specification of the '681 patent describes an optical amplification system that keeps the power per channel constant when the number of channels varies. The system does so by freezing the operation of the optical attenuator when it detects a control signal indicating a change in the number of channels. (A339(7:36-8:31); A334(Fig. 28).) The claims, however, are not directed to this system. They recite an attenuator for controlling a power level of an amplified WDM optical signal, but they do not recite a controller for freezing the optical attenuator. Instead, the claims recite only a controller that controls the gain applied to produce the amplified WDM signal. The claimed attenuator controls the power level of this amplified WDM signal, but the claims do not specify how or what type of control is performed. Thus, the claimed system does not require and will not necessarily produce a constant power level per channel when the number of channels varies.

In the system described in the specification, the monitor signal processing circuit 70 and photodiode $58_4$ are used to detect a control signal that indicates a variation in the number of channels. (A16887-89(643:7-645:1); A339(7:48-67, 8:11-17).) When this signal is detected, the monitor signal processing circuit "freezes" the operation of the optical attenuator, causing the attenuation, or light transmissivity, of the optical attenuator to be maintained constant. (A339(7:36-41, 7:55-64, 8:11-17).) By freezing the optical

14

attenuator, the output power per channel in the amplified optical signal remains constant, while the total power of the amplified signal is changing due to the addition or subtraction of channels.  (A339(7:36-8:31); A334(Fig. 28); *see also* A336(1:35-39); A337(3:11-31).)

The asserted claims do not claim this purported invention, because they do not recite an optical attenuator that is frozen when the number of channels changes or any control mechanism for freezing the optical attenuator.  Instead, the '681 patent merely claims a system in which the amount of amplification or gain supplied to a WDM optical signal is held constant and an optical attenuator "controls a level of the amplified WDM optical signal" (*e.g*., A346(claim 6)), in a variable channel count environment.  The validity disputes on appeal turn on whether the evidence established that the prior art disclosed an optical amplifier that amplifies an optical signal "having a variable number of channels associated with different wavelengths" and includes a controller that "controls the gain to be approximately constant," as required by these asserted claims. (A14, A18.)

## B.    Claim Construction.

For claim construction and other purposes, the district court defined a person of ordinary skill in the art to be a person having "at least a Master's degree in electrical engineering or physics and two to five years of experience in the field of

optical fiber transmission systems and the components for such systems."
(A11336-37; A18760(Uncontested Fact 8).) Based on that level of ordinary skill,
the court construed several claim terms related to the issues on appeal.

**Making the Gain "Substantially Even" or "Substantially Flat."** The
court construed "substantially even" and "substantially flat" to mean "largely, but
not wholly flat/even." (A11362-66.) The full claim limitation, as found in claim
6, is "an optical filter making the gain substantially even with respect to said
different wavelengths."

**"Optical Attenuator."** The court construed "optical attenuator" to mean "a
device having variable optical transmissivity." (A11366-72.) This construction
applies to the term as it appears in claims 6 and 8.

**"Making."** The court construed "making," as it appears in claim 6, to mean
"which makes." (A15244.)

**"Gain."** The court held that "gain" as it appears in asserted claims 6 and 7
should be given its ordinary meaning to a person of skill in the art. (A15205.)
Gain is a measure of the amount of power an optical amplifier provides to an
optical signal. (*Id.*)

Tellabs does not dispute any of these claim constructions on appeal.

### III.  The Prior Art.

#### A.  U.S. Patent No. 6,055,092.

The '092 patent is directed to a "Multi-Wavelength Light Amplifier."
(A15385-412.)  The patent is assigned to Fujitsu, and Miki Takeda, Terumi
Chikama, Yasushi Sugaya, and Susumu Kinoshita are named inventors, the latter
two being the co-inventors of the '681 patent.  (A15385.)  The '092 patent
application was filed on May 28, 1996, almost a year before the '681 patent's
priority date.  (*Id.*)  The parties stipulated that the '092 patent is prior art to the
'681 patent (A18760(Uncontested Fact 17)), and the application for the '092 patent
is referenced in the '681 patent (A336(1:26-28)).

The object of the invention claimed by the '092 patent "is to provide a multi-
wavelength light amplifier which does not have wavelength-dependence of the
gain, which is not changed due to a variation in the power of light."
(A15403(1:47-50)).)  The '092 patent discloses a system that amplifies a WDM
optical signal and employs an automatic gain control (AGC) circuit to maintain
constant gain, an automatic level control (ALC) circuit to control an optical
attenuator that controls the output level of the amplified WDM optical signal, and
an optical filter that makes the gain substantially even across different channel
wavelengths.  (*See, e.g.,* A15390(Fig. 3).)

17

Although the '092 patent does not specifically discuss the situation where the number of channels is changing, a change in the number of channels was a well-known "cause for changes in input power [of light]" to an optical amplifier. (*See* A16902(658:22-25) (inventor Sugaya); *see also* A16902(658:10-16).) And, the number of channels in a WDM optical signal system will inherently vary. This fact was acknowledged by PTO Examiner Hughes, who examined both the '681 patent and another application assigned to Fujitsu: U.S. Patent Application No. 11/742,508. The '508 Application is a divisional of U.S. Patent Application No. 10/956,107 – the same application that issued as the '681 patent. Examiner Hughes, in issuing a 35 U.S.C. § 102(a) rejection of the '508 Application, stated with respect to the '092 patent that "the number of channels is inherently variable because channels are inherently dropped." (A15323-26 (statement repeated on each page); A17168-69(922:4-23, 923:7-15); A17403(1156:18-1157:1).) Fujitsu did not dispute Examiner Hughes on this point. (*Id.*) One of ordinary skill in the art understood that, to function properly, an optical amplification system must account for these inherent changes, and the invention claimed by the '092 patent is expressly intended to provide a gain that "is not changed due to a variation in the power of light." (A15403(1:47-50).)

## B.     The July 1995 Sugaya Article.

The article *Configuration Design of Multi-Wavelength Er-Doped Fiber Amplifier for WDM Transmission System*, by Sugaya, Kinoshita, and Chikama ("July 1995 Sugaya Article") was published in July 1995.  (A15352-74.)  Messrs. Suguya and Kinoshita are the co-inventors named in the '681 patent.  (A305.)  The Article is prior art to the '681 patent, and it was not before the PTO examiner.  (A305-06; A17276(1029:13-20); A17543(1295:1-19); A17567-68(1319:17-1320:1).)

The July 1995 Sugaya Article discloses the use of an Er-doped fiber amplifier to amplify an optical signal in a WDM network that includes optical cross connect (OXC) systems.  (A15364.)  The optical signal is to be amplified with gain flatness, a high gain, a wide input dynamic range, and low noise.  (A15358 (Abstract); A15364.)

An OXC system is used for switching the path of an individual optical channel.  (A16986(741:3-11).)  According to Mr. Sugaya, an author of the article and co-inventor of both the '681 and '092 patents, this switching can result in the adding and dropping of channels.  (A16986(741:3-11); *see also* A17193(947:13-20); A17404-05(1157:16-1158:2).)  This amplifier, designed to operate in an OXC system, is therefore designed to operate in an environment in which the channel count can vary.

19

The July 1995 Sugaya Article further discloses an optical amplifier configured to maintain even or flat gain with respect to different wavelengths. (A15358.)  The disclosed optical amplifier includes an "automatic fiber gain control" circuit, *i.e.*, an AGC circuit, to keep the amplifier gain constant.  (A15358 (Abstract); A15362; A15364; A15365; A15372.)   The Article likewise discloses automatic level control using a variable optical attenuator.  (A15364; A15372.) The optical attenuator controls the output level of the amplified WDM signal in response to changes in power.  (A15364.)  The July 1995 Sugaya Article, therefore, discloses an amplifier that amplifies a WDM optical signal having a variable number of channels associated with different wavelengths and that includes a controller that controls the gain to be approximately constant.

## C.    U.S. Patent No. 5,083,874.

The '874 patent is directed to an "Optical Repeater and Optical Network Using the Same."  (A15328-51.)  The patent was filed on April 10, 1990 and is prior art to the '681 patent.  (*Id.*)   The '874 patent was not before the PTO examiner.  (A305-06.)

The '874 patent discloses the use of an optical filter to solve the problem of uneven gains and losses between multiple wavelengths in an optical signal so that the sum of the gains and the losses becomes constant or even. (*See* A15344(12:43-64).) Tellabs argued that, in combination with the July 1995 Sugaya Article, the '874 patent renders the '681 patent invalid as obvious.

## SUMMARY OF THE ARGUMENT

The asserted claims are invalid because every element of those claims is present in the prior art, and Fujitsu pointed to no substantial evidence to refute Tellabs' showing that the prior art amplifiers functioned in a variable channel count environment as recited in the claims. Instead, Fujitsu attempted to distinguish the prior art by arguing that the prior art amplifier was useful only in a fixed-channel environment because it did not freeze the operation of the optical attenuator to maintain constant power per channel. That feature is not required by the claims, however, and Fujitsu's arguments improperly imported attenuator features described in the specification into the gain control function recited in the claims. The district court's decision based on these arguments was error.

It is undisputed that the prior art teaches systems that amplify a WDM optical signal and employ an automatic gain control circuit to maintain constant gain, an automatic level control circuit to control an optical attenuator that controls the level of the amplified WDM optical signal, and an optical filter that makes the

21

gain substantially even across different channel wavelengths. It is therefore

undisputed that the prior art expressly teaches all of the elements of the asserted

claims, save one: that the amplifier amplify an optical signal having a variable

number of channels associated with different wavelengths. That element is

inherent in the prior art. The number of channels in a WDM optical signal will

necessarily vary, a fact explicitly noted by the '681 patent examiner and

undisputed by Fujitsu. Thus, the prior art optical amplifiers amplified an optical

signal inherently having a variable number of channels, and the '681 patent simply

claims this inherent capability of the prior art optical amplification systems. It is a

long-settled principle that such a claim is not patentable. *In re Pearson*, 494 F.2d

1399, 1403 (C.C.P.A. 1974) ("These terms merely set forth the intended use for, or

a property inherent in, an otherwise old composition. As the board pointed out,

such terms do not differentiate the claimed composition from those known to the

prior art.").

Thus, the district court erred in determining that the evidence supported the

conclusion that the prior art did not disclose an optical amplifier that amplifies an

optical signal "having a variable number of channels associated with different

wavelengths" and includes a controller that "controls the gain to be approximately

constant." It was on that basis that the court denied judgment as a matter of law on

both anticipation and obviousness.  That decision should be reversed, and judgment should be entered for Tellabs.

## ARGUMENT

### I.  Standard Of Review.

This Court reviews a district court's denial of a motion for judgment as a matter of law using the standard of the regional circuit — here, the Seventh Circuit, which applies *de novo* review.  *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011).  In applying the JMOL standard anew, the appellate court is bound by the same constraints as the district court in testing the sufficiency of the evidence in support of the jury's verdict.  *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 736 (Fed. Cir. 2002).

Under the Seventh Circuit standard, a court should grant JMOL if it finds that a reasonable jury would not have "a legally sufficient evidentiary basis" to find for the non-movant on a particular issue.  *May v. Chrysler Group, LLC*, 692 F.3d 734, 742 (7th Cir. 2012) (citing Fed. R. Civ. P. 50(a)(1)); *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 149 (2000); *Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293, 300-01 (7th Cir. 2009)).  This Court will reverse a district court's denial of a JMOL motion where the jury's findings are not supported by substantial evidence or cannot support the legal conclusions drawn by the jury or the judge.  *New Idea Farm Equip. Corp. v. Sperry Corp.,* 916 F.2d 1561, 1565-66

(Fed. Cir. 1990). "[A] mere scintilla of supporting evidence will not suffice."

*Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1173 (7th Cir. 2002) (quotation omitted).

Anticipation is a question of fact that is reviewed for substantial evidence

when tried to a jury. *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed.

Cir. 2007). Obviousness is a question of law based on underlying findings of fact.

*In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009). The Court reviews the jury's

determinations of underlying fact for substantial evidence, but reviews the ultimate

conclusion of obviousness *de novo*. *W. Union Co. v. MoneyGram Payment Sys.,*

*Inc.*, 626 F.3d 1361, 1369 (Fed. Cir. 2010).

## II.    The District Court Erred by Denying Judgment as a Matter of Law That the '681 Patent is Invalid as Anticipated by the '092 Patent.

A patent claim is anticipated under 35 U.S.C. § 102 when (1) a single prior

art reference discloses every element in the claim, either explicitly or inherently

and (2) a person of ordinary skill in the field of the invention, looking at the single

prior art item, would be able to make and use the invention disclosed in the claim.

*Finisar Corp. v. DirecTV Group, Inc.,* 523 F.3d 1323, 1334 (Fed. Cir. 2008);

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir.

1998).

Independent claim 6 of the '681 patent requires an optical amplifier that (1)

amplifies a wavelength-division multiplexed signal having a variable number of

channels associated with different wavelengths and (2) outputs the amplified

24

signal.  The amplifier includes an optical attenuator that controls a level of the

amplified signal, an optical filter that makes gain substantially even for different

wavelengths, and a controller that controls the gain to be substantially constant.

(A346(22:35-46).)  There is no dispute that the '092 patent expressly discloses

every element of the claim, except for the inherent variability of the WDM optical

signals.

Specifically, the '092 patent expressly discloses a "light amplifier . . .

capable of amplifying all the wavelengths to be multiplexed so that the light

amplifier does not have the wavelength-dependence of the gain, which is not

changed due to a variation in the power of the input light."  (A15405(6:46-50).)

The amplifier of the '092 patent includes an optical attenuator, a gain-flattening

filter, and a gain controller.  (*See, e.g.,* A15390(Fig. 3).)  A comparison of Figure

17 of the '681 patent with Figure 3 of the '092 patent highlights the close

correspondence between the two:



(A323 ('681 patent Fig. 17) (annotated).)



(A15390 ('092 patent Fig. 3) (annotated).)

The only difference between the structures disclosed in these figures is the

monitor signal processing circuit in Figure 17 of the '681 patent. Fujitsu conceded

that this component is not a required element of the asserted claims

(A16816(572:7-9) (Fujitsu redirect of Dr. Willner: "Is monitor signal processing

circuit required by the claims of the patent, 6, 7, or 8? A. No.")), and instead

argued that the '092 patent does not disclose amplifying an optical signal having a

variable number of channels and utilizing a controller to control the gain to be

approximately constant. Because the '092 patent discloses an amplifier that (a)

amplifies a WDM optical signal with an inherently variable number of channels

and (b) includes a controller to control the gain to be approximately constant, the

'092 patent anticipates the asserted claims, and judgment as a matter of law is

appropriate.

### A. Claim 6 is Anticipated by the '092 Patent.

Every element of claim 6 is disclosed in the '092 patent, either expressly or

inherently, including the amplification of an optical signal "having a variable

number of channels associated with different wavelengths" and a controller that

"controls the gain to be approximately constant."

### 1. The '092 Patent Discloses an Amplifier That Amplifies an Optical Signal Inherently "Having a Variable Number of Channels Associated with Different Wavelengths" and Includes a Controller that "Controls the Gain to be Approximately Constant."

Claim 6 claims "[a]n apparatus comprising: an optical amplifier which

amplifies a wavelength division multiplexed (WDM) optical signal *having a*

*variable number of channels* associated with different wavelengths with a gain and outputs the amplified WDM optical signal, the optical amplifier including . . . a *controller which controls the gain to be approximately constant.*" (A346(22:35-46) (emphasis added).) The district court denied JMOL of anticipation based on its determination that the evidence supported the conclusion that the '092 patent did not disclose an optical amplifier capable of controlling the gain to be approximately constant in a variable channel count environment. That determination was wrong.

        a)      An "Amplifier Which Amplifies a Wavelength Division Multiplexed (WDM) Optical Signal . . . With a Gain."

It is undisputed that the '092 patent discloses an amplifier that amplifies a WDM optical signal with a gain. The '092 patent expressly discloses "a multi-wavelength light amplifier capable of amplifying a wavelength division multiplexed signal." (A15403(1:16-18); *see also* A15385(Abstract); A15403(1:24-27).) The inventor agreed. (A16899(655:5-16); *see also* A17125(880:3-10); A17171-73(925:18-926:2, 926:11-927:10).)

        b)      An Amplifier that Amplifies a WDM Optical Signal Having Channels "Associated With Different Wavelengths."

This element of claim 6 is also undisputed. The '092 patent discloses an amplifier that amplifies a WDM optical signal comprising a plurality of channels

associated with different wavelengths. (A15385(Abstract); A15389(Fig. 2);

A15391(Fig. 4); A15393(Fig. 6); A15403(1:24-27, 1:47-50); A15405(6:46-50)

("The light amplifier shown in FIG. 1 is capable of amplifying all the wavelengths

to be multiplexed so that the light amplifier does not have the wavelength-

dependence of the gain, which is not changed due to a variation in the power of the

input light."); A17170(924:2-25).)

> c) An Amplifier that Amplifies a WDM Optical Signal
> "Having a Variable Number of Channels."

Fujitsu argued that the '092 patent does not disclose an optical amplifier

with a controller to control the gain to be approximately constant in a variable

channel count environment (A17850-58), and the district court concluded that the

evidence was sufficient to permit the jury to find that the '092 patent did not

disclose this element. (A14.) The amplifier disclosed by the '092 patent, however,

is capable of amplifying a WDM optical signal having a variable number of

channels, and it operates on WDM signals in which the channel count is inherently

variable.

The number of channels in a WDM optical signal necessarily varies as

channels are added or dropped by the optical transmission system. As noted

above, this fact was confirmed by PTO Examiner Hughes, who examined both the

'681 patent and its divisional '508 Application, which was also assigned to Fujitsu.

(A15323-26 ("...the number of channels is inherently variable because channels

are inherently dropped…"); A17168-69(922:4-23, 923:7-15) (Fujitsu did not dispute Examiner Hughes' statements); A17403(1156:18-1157:1) (Dr. Buckman's confirmation of Examiner Hughes' understanding).)  As explained by Tellabs' expert Dr. Buckman, common sense dictates that, even if channels are not intentionally added to or dropped from the optical signal, the components of these optical systems cannot last forever.  (A17125-26(880:11-881:14).)  When an individual laser that powers an individual channel fails, the system continues to function, but that individual channel is dropped, thereby causing a variation in the number of channels.  (A17125-28(880:11-883:2); A17403-04(1156:8-1157:1).)  It is irrelevant to the operation of the amplifier whether this change in the number of channels is due to a laser failure or an intentional dropping of a channel.  (A17180-81(934:1-935:13) (Dr. Buckman addressing intentional vs. unintentional changes in channel count:  "Regardless of the cause of the change in input power, the goal of the automatic gain control circuit is to keep the gain across the erbium-doped fiber constant.").)

The amplifier described by the '092 patent is designed to operate in such a variable channel count environment.  The inherent variation in the number of channels will cause a variation in the power level of the input light.  (A16902(658:10-16, 658:22-25); A17180-81(934:19-935:13).)  The amplifier disclosed by the '092 patent compensates for this inherent phenomenon:  the stated

object of the '092 patent invention is "to provide a multi-wavelength light amplifier which does not have wavelength-dependence of the gain, *which is not changed due to a variation in the power of the input light*." (A15403(1:47-50)) (emphasis added); *see also* A15405(6:46-50) ("The light amplifier shown in FIG. 1 is capable of amplifying all the wavelengths to be multiplexed so that the light amplifier does not have the wavelength-dependence of the gain, *which is not changed due to a variation in the power of the input light*.") (emphasis added).) The broad disclosure of the '092 patent is not limited to particular causes of a change in the power of the input light. Rather, the '092 patent's invention compensates for *any* variation in the power of the input light – whether caused by an intentional change in the number of channels, a laser failure resulting in the dropping of channels, span loss (*i.e.*, power lost due to an aging optical fiber, degraded connectors, bends in the fiber, *etc.* (A16604-05(361:20-362:6))), or otherwise. One of skill in the art at the time of the invention, as evidenced by the undisputed statement by Examiner Hughes, understood that this prior art amplifier operated in an environment where these events would occur and the number of channels would necessarily vary.

Thus, whether or not expressly referenced in its specification, the amplifier controller disclosed by the '092 patent operates to control the gain to be approximately constant in an inherently variable channel count environment. The

31

gain the amplifier provides is constant and "is not changed due to a variation in the power of the input light." (A15405(6:46-50).)  Every element required to accomplish this result and disclosed by the '681 patent for this purpose — namely, the automatic gain control (AGC) circuit discussed below — is present in the optical amplifier device disclosed by the '092 patent.  The '681 patent does nothing more than identify one specific cause for a power change already encompassed by the broad disclosure of the '092 patent.

"[A] prior art reference without express reference to a claim limitation may nonetheless anticipate by inherency.  Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claim limitations, it anticipates." *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375-76 (Fed. Cir. 2005) (internal citations and quotations omitted).  And it is irrelevant whether the '681 patent inventors, or anyone else, recognized this inherency at the time: "Inherency is not necessarily coterminous with knowledge of those of ordinary skill in the art.  Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art." *MEHL/Biophile Intern. Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).  The district court erred in determining that the evidence supported the conclusion that the '092 patent did not inherently anticipate claim 6 with respect to this element.

d)    An Amplifier that Includes "a Controller Which Controls the Gain to be Approximately Constant."

The district court further erred by concluding that the evidence established that the '092 patent did not disclose the claimed controller that "controls the gain to be approximately constant" in a variable channel count environment.  (A14.)

Specifically, and much like the '681 patent, the '092 patent discloses an AGC circuit, elements $6_1$ and/or $6_2$ as shown below in annotated Figure 3 of the '092 patent.  (A15390(Fig. 3); *see also* A15388(Fig. 1); A15392(Fig. 5); A15395-402(Figs. 8-15).)  As explained above (*supra* at 10-11), this AGC circuit controls the gain to be approximately constant and operates as follows:

> The first-stage light amplifier has a first AGC (automatic gain control) system so that a ratio of the input light and the first light output is constant. The second stage light amplifier has a second AGC system so that a ratio of the first light output and the second light output is constant.

(A15403(2:57-62); *see also* A15403-04(2:64-3:47); A15405(5:31-60) ("An AGC system including the AGC circuit $6_1$ and the above input and output monitors performs an AGC control of the pump source $9_1$ so that the ratio of the light input power level detected by the light input monitor and the light output power level detected by the light output monitor can be maintained at a constant value."); A15408(11:66-12:20); A15409(13:5-35).)  At trial, Mr. Sugaya confirmed that element $6_1$ is an AGC circuit that keeps the gain constant across Er-doped fiber element 7.  (A16899-900(655:17-656:2).)  Fujitsu's expert Dr. Willner explained

that an AGC circuit "maintain[s] constant gain across the erbium-doped fiber."

(A16650(407:23-25).)



(A15390(Fig. 3) (annotated).)

Because the controller disclosed in the '092 patent keeps the ratio of the
output light power level to the input light power level constant, this controller
controls the gain to be approximately constant when the power level of the WDM
optical signal is changing. It does so no matter the cause for the variation in
power. (A16902(658:10-16, 658:22-25); A17179-81(933:21-934:13, 934:19-
935:13) ("That's what automatic gain control circuits do. They determine the gain,
determine how different it is from the gain that they want to have, and adjust the
pump laser . . . to achieve that desired gain. . . . Regardless of the cause of the
change in input power, the goal of the automatic gain control circuit is to keep the
gain across the erbium-doped fiber constant.").) Thus, the '092 patent discloses

34

not only a controller "which controls the gain to be approximately constant," but a controller that controls the gain to be approximately constant in a variable channel count environment. (*See* A16899-900(655:23-656:19); A17179-81(934:19-935:13)).)

>    **2.    All Remaining Elements of Claim 6 are Disclosed by the '092 Patent.**

It is undisputed that the '092 patent discloses the remaining elements of claim 6: an "apparatus comprising: an optical amplifier which . . . outputs the amplified WDM optical signal," further including "an optical attenuator which controls a level of the amplified WDM optical signal," and "an optical filter making the gain substantially even with respect to said different wavelengths." (A346(22:35-46)).)

The '092 patent discloses a multi-wavelength light amplifier, which is clearly an "apparatus" as required by claim 6. (A15385(title); A17124-25(879:20-880:2)).)

The '092 patent further discloses an optical attenuator (variable attenuator, element 11) as shown below in annotated Figure 3 from the '092 patent (A15390).



As claimed, the '681 patent requires "an optical attenuator which controls a level of the amplified WDM optical signal." (A346(claim 6).) The variable attenuator disclosed by the '092 patent controls the level of the output light, *i.e.*, the amplified WDM optical signal. This is shown by the '092 patent figures illustrating the variable optical attenuator. (*See* A15388(Fig. 1); A15390(Fig. 3); A15392(Fig. 5); A15395-402(Figs. 8-15).) Dr. Buckman confirmed that element 11 of the '092 patent is a variable optical attenuator that controls the level of the amplified optical signal. (A17173(927:15-24).)

The '092 patent further describes the optical attenuator as follows:

The optical system which maintains the second light output of the second-stage light amplifier at a constant power level comprises *a variable attenuator* [element 11] which is provided between the first-stage light amplifier and the second-stage light amplifier and attenuates the first output signal on the basis of the power level of the second light output. …[or] *a variable attenuator* [element 11] which is provided so as to follow the second-stage light amplifier and

36

> attenuates the second output signal on the basis of the power level of an attenuated second light output from the variable attenuator. …[or] *a variable attenuator* [element 11] which is provided between the first-stage light amplifier and the second-stage light amplifier and attenuates the first output signal on the basis of the power level of an attenuated first light output from the variable attenuator.

(A15404(3:64-4:20) (emphasis added); *see also* A15405(5:16-30);

A15406(8:47-51); A15409(13:66-14:12).)

The '092 patent explains that the optical attenuator (element 11) is controlled by an automatic level control (ALC) circuit (element 14). (A15388(Fig. 1); A15390(Fig. 3); A15392(Fig. 5); A15395-402(Figs. 8-15); A15405(5:17-30, 6:26-40); A15409(13:48-56, 13:66-14:12); A15409-11(claims 1, 3-6, 9, 13-15, 17-20, 22, 25-27); A17173(927:15-24).) As described above, this ALC circuit changes the attenuation level of the optical attenuator (element 11), *i.e.*, its transmissivity, to control the level of the amplified WDM optical signal. (*See, e.g.,* '092 patent description at A15409(13:48-56).) As the '092 patent explains, "The [electrical signal corresponding to the light level from the second stage] is applied to the variable attenuator 11, and the amount of attenuation caused therein is varied on the basis of the light level detected by the photodiode 13." (A15405(6:26-40).) The variable attenuator therefore acts to keep the power level constant: "In short, the variable attenuator 11 maintains the level of the output light of the second-stage amplifier 1 at the predetermined constant level." (A15406(8:47-51); *see also* A15409-11(claims 1, 3-6, 9, 13-15, 17-20, 22, 25-27).)

The '092 patent likewise discloses an "optical filter which makes the gain substantially even with respect to said different wavelengths," as required by claim 6 of the '681 patent.  (*See* A18761(Uncontested Fact 25) ("The '092 Patent discloses an optical filter which makes the gain substantially even with respect to different wavelengths.").)  Specifically, the '092 patent discloses an optical filter (element 15) as shown below in annotated Figure 3 from the '092 patent (A15390).



The corresponding description of this optical filter (element 15) in the '092 patent explains that the optical filter makes the gain substantially flat or even with respect to wavelength:

> The optical filter compensates for the difference between the first and second linear gain slopes *so that a flat gain vs wavelength characteristic of the multi-wavelength light amplifier can be obtained*.

(A15403(2:51-55) (emphasis added);  *see also* A15406(8:19-46); A15407(9:8-29, 9:47-53); A15391(Fig. 4).)

38

In fact, there can be no dispute that the '092 patent discloses the gain-flattening filter required by the '681 patent — the '681 patent specifically incorporates the '092 patent by reference for its disclosure of a filter "for correcting wavelength dependency of the gain."  (A343(16:42-45); A16956-58(711:21-713:17); A17175(929:20-931:23).)

Finally, the '092 patent discloses that the optical amplifier outputs the amplified WDM optical signal.  (A15403(1:46-50); A15390(Fig. 3); A17172-73(926:21-927:10).)

Every element of claim 6 of the '681 patent therefore is present in the '092 patent.  (A17181(935:14-23).)  The amplifier disclosed in the '092 patent is capable of amplifying a WDM optical signal with an inherently variable number of channels, and it includes the same AGC controller disclosed in the '681 patent to "control[] the gain to be approximately constant."  Claim 6 is anticipated by the '092 patent, and judgment as a matter of law is appropriate.

### B. Claim 7 is Anticipated by the '092 Patent.

Dependent claim 7 requires that the controller claimed by claim 6 specifically control the gain "to be approximately constant during variation of the number of channels in the WDM optical [signal]."  (A346(22:47-49).)  It likewise is anticipated by the '092 patent.  (A17182(936:3-16).)

39

As explained above (pp. 33-35), the '092 patent discloses a controller that controls the gain to be approximately constant. (*See, e.g.,* A15403-04(2:56-3:47).) Dr. Buckman explained that this is the role of the '092 patent's controller element $6_1$: "That's what automatic gain control circuits do. They determine the gain, determine how different it is from the gain that they want to have, and adjust the pump laser, labeled PS in this figure, element 9, to achieve that desired gain." (A17179-81(933:21-934:13, 934:19-935:13).) Because this controller keeps the ratio of the output light power level to the input light power level constant, the controller inherently controls the gain to be approximately constant when the input power is changing during a variation of the number of channels in the WDM optical signal. As inventor Sugaya explained, the '092 patent addresses "changes in the total input power" (A16902(658:10-25)), and the AGC circuits in the '092 patent's amplifier are "seeking to keep the gain constant, even if the input power changes." (A16956(711:8-20); *see also* A17179-81(933:21-934:13, 934:19-935:13); A15403(1:47-50); A15323-26.) Thus, the '092 patent discloses a controller that "controls the gain to be approximately constant during variation of the number of channels in the WDM optical signal." (*See* A16899-900(655:23-656:19); A17180-82(934:19-935:13, 936:3-16).)

Every element of claim 7 of the '681 patent is present in the '092 patent. (A17182(936:3-16).) Claim 7 was anticipated by the '092 patent, and judgment as a matter of law is appropriate.

###### C.     Claim 8 is Anticipated by the '092 Patent.

Dependent claim 8 requires that the attenuation level of the optical attenuator claimed by claim 6 be changed in order to control the level of the amplified WDM optical signal. (A346(22:50-52).) Because this is the stated purpose of the variable optical attenuator in the '092 patent, the '092 patent anticipates claim 8.

Specifically, the '092 patent discloses an optical attenuator (variable attenuator, element 11) with an attenuation level that is changed to control the level of the amplified WDM optical signal. The patent figures disclose such an attenuator. (*See* A15388(Fig. 1); A15390(Fig. 3); A15392(Fig. 5); A15395-402(Figs. 8-15).) And, as explained above (pp. 35-37), the '092 patent specifically discloses that the ALC circuit changes the attenuation level of the optical attenuator (element 11), *i.e.*, its transmissivity, to control the level of the amplified WDM optical signal. (A15405(5:23-25) ("The variable attenuator 11 is controlled by an automatic level control (ALC) circuit 14..."); A15406(8:47-51) ("[T]he variable attenuator 11 maintains the level of the output light of the second-stage amplifier 1 at the predetermined constant level."); A15408(11:27-39);

41

A15409(13:48-56).)  Dr. Buckman also confirmed that the attenuator of the '092

patent controls the level of the amplified optical signal.  (A17173(927:15-24).)

Every element of claim 8 of the '681 patent is present in the '092 patent.

(A17182(936:17-25).)  Claim 8 was anticipated by the '092 patent, and judgment

as a matter of law is appropriate.

**III.    The District Court Erred by Denying Judgment as a Matter of Law that the '681 Patent is Invalid as Obvious Under 35 U.S.C. § 103 in View of the July 1995 Sugaya Article in Combination with the '874 Patent.**

A patent claim is invalid as obvious under 35 U.S.C. § 103 when "the

differences between the subject matter sought to be patented and the prior art are

such that the subject matter as a whole would have been obvious at the time the

invention was made to a person having ordinary skill in the art to which said

subject matter pertains."  Obviousness is a question of law, but it rests on

underlying factual findings: (1) the scope and content of the prior art; (2) the level

of ordinary skill in the art; (3) the differences between the claimed invention and

the prior art; and (4) evidence of secondary factors, such as commercial success,

long-felt need, and failure of others.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18

(1966).  Unlike anticipation, obviousness may be shown by considering two or

more items of prior art in combination.  *See, e.g., KSR Int'l Co. v. Teleflex Inc.*,

550 U.S. 398, 424-26 (2007).

Tellabs argued at trial that the July 1995 Sugaya Article disclosed every element of the asserted claims except a gain-flattening optical filter and that the '874 patent disclosed such a filter. The district court held that the Article did not disclose an optical amplifier that (a) amplifies an optical signal having a channel count that is variable and (b) includes a controller to control the gain to be approximately constant, as required by the asserted claims. (A18.) That conclusion is erroneous. The Article discloses such an amplifier and, in combination with the '874 patent, renders each of the asserted claims of the '681 patent invalid as obvious.

> **A.** **Claim 6 is Obvious in View of the July 1995 Sugaya Article and the '874 Patent.**
>
> > **1.** **The July 1995 Sugaya Article Discloses an Amplifier that Amplifies an Optical Signal "Having a Variable Number of Channels Associated with Different Wavelengths" and Includes a Controller that "Controls the Gain to Be Approximately Constant."**

Claim 6 claims "[a]n apparatus comprising: an optical amplifier which amplifies a wavelength division multiplexed (WDM) optical signal *having a variable number of channels* associated with different wavelengths with a gain and outputs the amplified WDM optical signal, the optical amplifier including . . . a *controller which controls the gain to be approximately constant*." (A346(22:35-46) (emphasis added).)

a)      An "Amplifier Which Amplifies a Wavelength Division
           Multiplexed (WDM) Optical Signal . . . With a Gain."

It is undisputed that the July 1995 Sugaya Article discloses Er-doped fiber

amplifiers that amplify a WDM optical signal with a gain.  (A15358(Abstract);

A15360-62(Figs. 1-3); A15368-69(Figs. 7, 8); A15372(Fig. 10); A17185-

86(939:24-940:6).)  The disclosed optical amplifiers include two Er-doped fiber

stages, highlighted in green in the figure below, each of which provides power to a

WDM optical signal that passes through it, and thus the amplifier "amplifies a . . .

[WDM] optical signal . . . with a gain."  (A15367(Fig. 6); A17191(945:5-19);

A17192(946:5-8).)



(A15367(Fig. 6) (annotated).)

44

       b)    An Amplifier that Amplifies a WDM Optical Signal Having Channels "Associated With Different Wavelengths."

It is also undisputed that the July 1995 Sugaya Article discloses that the channels within the optical signal are "associated with different wavelengths." (A15358(Abstract); A15360-62(Figs. 1-3); A15367-70(Figs. 6-9 ); A15372(Fig. 10); A17190(944:4-20).)  For example, Figure 7 of the Article shows four channels, each having different wavelengths.  (A15368(Fig. 7).)  Similarly, Figure 10 shows sixteen channels having different wavelengths as well.  (A15372(Fig. 10); *see also* A15358(Abstract); A15364; A17190(944:4-20).)

       c)    An Amplifier that Amplifies a WDM Optical Signal "Having a Variable Number of Channels."

Fujitsu argued that the July 1995 Sugaya Article does not disclose an optical amplifier with a controller that can control the gain to be approximately constant in a variable channel count environment (A17862-65), and the district court concluded that the evidence was sufficient to permit the jury to agree.  (A18.)  The district court erred, because the amplifier disclosed by the July 1995 Sugaya Article is (a) capable of amplifying a WDM optical signal having a variable number of channels and (b) expressly designed for use in an optical cross-connect ("OXC") system, a system which involves varying the number of channels.

As established above, the number of channels in a WDM optical signal system is inherently variable.  (*See supra* at 29-30; A15323-26 ("…the number of

45

channels is inherently variable because channels are inherently dropped…”);

A17168-69(922:4-23, 923:7-15) (Fujitsu did not dispute Examiner Hughes'

statements); A17403(1156:18-1157:1) (Dr. Buckman confirmed Examiner

Hughes' understanding).)   In addition to this inherent variability in the number of

channels, the number of channels in an OXC system will vary as the paths of

individual channels are switched, meaning an individual channel can be moved to

another path and effectively dropped from its current optical fiber link.

(A17193(947:13-20) (“One purpose of an optical cross-connect system is to switch

channels in and out of a particular optical fiber link, to change the number of

channels.”); A17189(943:1–5).)  This fact was confirmed by Mr. Sugaya, Fujitsu's

own witness and inventor, who explained that, in an OXC system, the switching of

the optical paths of the light can result in the adding and dropping of channels.

> Q. Mr. Sugaya, my question was an optical cross-connect system is used for adding and dropping channels, correct?
>
> A. I would -- rather than calling it add or dropping, I would say it is for *switching the optical path of light. That's what cross-connect means.*
>
> Q. Mr. Sugaya, switching the optical path of light can result in adding or dropping channels, correct?
>
> A. Ultimately, there are, I think, WDM network systems in which that switching would lead to that result, yes.

(A16986(741:3-11) (emphasis added).)  Whether one refers to a channel as having

“switched paths” or as having been dropped from a particular optical fiber link, the

46

result is the same:  a variation in the number of channels.  (A17193(947:13-20); A17404-05(1157:16-1158:2)).)

Section 3.1 of the July 1995 Sugaya Article itself discloses the use of optical amplifiers in systems with optical cross connects in which various routes can be selected.  (A15364.)  Specifically, the Article explains that to be used in an OXC system, the amplifier must control the output level and secure wide input dynamic ranges with automatic level control.  (*Id.*)  In other words, the amplifier had to account for dynamic changes in the power level of the optical signal, including those that occur when channels are added and dropped in an OXC system.  (*See* A16902(658:10-16, 658:22-25) (Mr. Sugaya confirms that changes in the number of channels cause changes in input power).)

Mr. Sugaya and his co-inventor Dr. Kinoshita did not disclose the July 1995 Sugaya Article to the examiner who examined the '681 patent application.  (A306; A17276(1029:13-20).)  Rather, they disclosed a June 1995 article entitled "Novel Configuration for Low-Noise and Wide-Dynamic-Range Er-Doped Fiber Amplifier for WDM Systems."  (A15413-16; A306; A17381-83(1134:23-1136:24).)  While the June and July articles are similar, the June article does not mention using the amplifiers in WDM networks that include OXC systems.  (A17279-80(1032:10-1033:17); A17381-83(1134:23-1136:24); A17405-06(1158:3-1159:16).)  This missing fact — that the prior art amplifier could be

47

used in the variable channel count environment of an OXC (optical cross connect) system — thus was not before the examiner prior to issuance of the '681 patent. (A17279-80(1032:10-1033:17); A17405-06(1158:3-1159:16)).

> d)    An Amplifier that Includes "a Controller Which Controls the Gain to be Approximately Constant."

The July 1995 Sugaya Article discloses a controller that controls the gain to be approximately constant. Specifically, as acknowledged by Mr. Sugaya at trial, it discloses an automatic gain control circuit. (A16952(707:18-24) ("What that does is automatically control gain."); A16954(709:21-25); A16956(711:8-20).) The July 1995 Sugaya Article describes the function of this controller, stating "the 2 stage EDFA [erbium-doped fiber amplifier] executes mean automatic gain control." (A15364; *see also* A15358(Abstract); A15362(Fig. 3); A15362-64; A15365(Fig. 5).) Dr. Buckman confirmed that the Article discloses an AGC circuit that holds the gain constant. (A17197-98(951:15-952:23).) And, Fujitsu's expert Dr. Willner explained that an AGC circuit is a controller that controls the gain to be approximately constant. (A16650(407:23-25) (an AGC circuit "maintain[s] constant gain across the erbium-doped fiber."); *see also* A15405(5:40-45).)

Further, as noted above with respect to the '092 patent (pp. 33-35), an AGC circuit will attempt to keep the gain approximately constant regardless of changes in input power. (A17179-80(933:21-934:13); A17180-81(934:19-935:13).) Such

48

a change in input power can be caused by a variation in the number of channels, and the disclosed AGC circuit is "a controller which controls the gain to be approximately constant" during such variation in the number of channels in a WDM optical signal. As Mr. Sugaya explained, changes in channel count cause changes in the input power and the AGC circuit will keep the gain constant even if input power changes. (A16902(658:10-16, 22-25); A16956(711:8–20).) Dr. Buckman confirmed that the Article discloses an AGC circuit that holds the gain constant even during changes in the number of channels. (A17197-98(951:15-952:23).)

2.      **All Remaining Elements of Claim 6 are Disclosed by the July 1995 Sugaya Article, In Combination with the '874 Patent.**

It is undisputed that the July 1995 Sugaya Article, in combination with the '874 patent, discloses all of the remaining elements of claim 6: *i.e.,* an "apparatus comprising: an optical amplifier which . . . outputs the amplified WDM optical signal," further including "an optical attenuator which controls a level of the amplified WDM optical signal," and "an optical filter making the gain substantially even with respect to said different wavelengths." (A346(22:35-46).)

The Sugaya Article discloses erbium-doped fiber amplifiers, which are an "apparatus" as required by claim 6. (*See* A15358(Title and Abstract); A17185(939:16-23).) These erbium-doped fiber amplifiers include an output

49

terminal through which the optical amplifier outputs the amplified WDM optical signal. (A15358(Abstract); A15360-62(Figs. 1-3); A15365(Fig. 5); A15367-69(Figs. 6-8); A15372(Fig. 10); A17193-94(947:23-948:19).)

The Article also discloses "an optical attenuator which controls a level of the amplified WDM optical signal." (A15358(Abstract) (". . . in order to provide an automatic level control, an optical attenuator positioned in a mid stage was used"); *see also* A15364-66; A15370-72.) Mr. Sugaya confirmed that the Article disclosed such a variable optical attenuator, labeled "ATT" (A16955(710:11-15)), and this attenuator is highlighted in purple in Figure 5 below. (A15365(Fig. 5) (annotated); *see also* A15367(Fig. 6).)



The article further discloses that the optical attenuator is controlled by an automatic level control (ALC) circuit:

> In order to maintain gain flatness, it is necessary that the 2 stage EDFA [erbium-doped fiber amplifier] executes mean automatic gain control. At the time, it is desirable to set up in the mid stage a light

attenuator for light automatic level control in order to decrease the burden of pump light power accompanied by the increase of the input and output level at the 2nd stage and to adopt wide input dynamic ranges.

(A15364.)  The Article discloses that the attenuation level of the optical attenuator is changed to control the level of the amplified WDM optical signal.  (A15364-66; A15365(Fig. 5); A15367(Fig. 6) (the diagonal line through the box marked "ATT" indicates that the attenuation level of the attenuator can be varied).)  Dr. Buckman confirmed that the Article's attenuator is a variable optical attenuator.  (A17194-95(948:20-949:9); A17275-76(1028:4-11, 1028:18-1029:3).)

With respect to the remaining element, the gain-flattening filter, Mr. Sugaya identified the cut-off filter of the Article as a gain-flattening filter.  (A15365(Fig. 5); A16948-49(703:20-704:8); A16949(704:1-8); A16951(706:16-18); A16952(707:13-17).)  Although this statement was an admission that the Article disclosed this claim element, Tellabs did not rely on it because Tellabs' expert, Dr. Buckman, disagreed that a cut-off filter could be considered a gain-flattening filter. Dr. Buckman concluded, however, that the use of a gain-flattening filter with the optical amplifier described by the Article would have been obvious to one of ordinary skill in light of, for example, the '874 patent (*see infra* at 53-55). (A17219(973:16-23); A17221(975:5-21); A17274-75(1027:12-1028:3); *see also* A15328-51).)

51

Figure 26 of the '874 patent (below) illustrates an optical amplifier, element

10. (A15338 (highlighting added).) This optical amplifier includes two Er-doped

fibers, identified as elements $14_{-1}$ and $14_{-2}$. Between these two Er-doped fibers is

an optical filter, identified as element 32. (*Id.*; A17221-22(975:22-976:22).) The

placement of this filter is analogous to the placement of the filter in both the '681

patent and the July 1995 Sugaya Article. (A17223(977:3-10); A17224(978:6-14).)



The '874 patent also explains that an Er-doped fiber, when amplifying an

optical signal with multiple wavelengths, does not provide the same gain to each

wavelength. (A15344(12:50-64); A17225(979:5-18).) To solve this problem of

uneven gains and losses, the '874 patent discloses the use of an optical filter so that

the sum of the gains and the losses becomes constant or even with respect to the

various wavelengths in the optical signal. (A17225-26(979:19-980:6);

A15344(12:50-64).) Thus, the '874 patent discloses that its optical filter element

32 is "an optical filter which makes the gain substantially even with respect to said different wavelengths." (A17226(980:10-16).)

### 3. One of Ordinary Skill in the Art Would Have Been Motivated to Combine the Teachings of the July 1995 Sugaya Article with those of the '874 Patent.

The July 1995 Sugaya Article discloses the problem of gain tilt due to the uneven gain of the Er-doped optical fiber. (A15360(Fig. 1); A17229-31(983:7-985:11).) The '874 patent also discloses the problem of gain tilt and explains that, if no adjustment is made to correct for gain tilt, "the gains for the respective wavelengths vary more and more largely until the gain for signal light of a certain wavelength exceeds the linear operation range of the optical amplifying element, making normal signal light transmission infeasible." (A15344(12:50-56).) To avoid this problem, the '874 patent proposes the use of an optical filter "which has a desired transmission characteristic of signal light of each wavelength…so that the sum of the gain of the optical amplifying element for the signal light of each wavelength and the transmission loss of the signal light by the optical signal transmission fiber becomes substantially constant." (A15344(12:56-64).)

As explained by Dr. Buckman, one of skill in the art would have been motivated to employ the gain-flattening filter from the '874 patent with the amplifier of the July 1995 Sugaya Article in order to achieve a gain that is flat with respect to wavelength. (A17229-31(983:7-985:11).) This is the exact use and

effect described in the '874 patent. (A15344(12:43-64).) The combination is obvious because it is merely "the predictable use of prior art elements according to their established functions." *KSR Int'l*, 550 U.S. at 417.

Moreover, an amplifier that produces gain that is not wavelength-dependent can be operated at higher gain levels (A17229-31(983:2-985:11); A15344(12:43-64)), and, as explained above (p. 9), the ability to operate optical amplifiers at higher gain levels provides more power to the optical signal to counter the losses suffered by the signal as it propagates over a long span. These higher gain levels permit greater distances between amplifiers because each amplifier provides the optical signal more power. (*Supra* at 9.) This ability to move amplifiers further apart reduces the number of required amplifiers and the related cost. (*Id.*) Thus, one of ordinary skill would have been motivated to combine the teachings of the July 1995 Sugaya Article with those of the '874 patent, because "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR Int'l*, 550 U.S. at 421.

### 4. Combining the July 1995 Sugaya Article with the '874 Patent Would Have Produced Predictable Results.

According to the district court, a person of skill in the art would have at least a Master's degree in electrical engineering or physics and two to five years

experience in the field of optical fiber transmission systems and the components for such systems. (A11336-37.) With this level of education and experience, a person of skill in the art would readily predict that the addition of the optical filter disclosed in the '874 patent would permit tuning of the gain provided by the optical amplifier disclosed in the July 1995 Sugaya Article. (A17229-31(983:7-985:20).) Mr. Sugaya identified the cut-off filter of the July 1995 Sugaya Article as such a gain-flattening filter. (A16948-49(703:20-704:8); A16949(704:1-8); A16951(706:16-18); A16952(707:13-17).) Even without that disclosure, a person of skill in the art would understand the need for, and be able to predict the result of, adding the filter disclosed in the '874 patent to the optical amplifier disclosed in July 1995 Sugaya Article. "[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR Int'l,* 550 U.S. at 416.

### 5. Fujitsu Presented No Evidence of Secondary Considerations.

The Supreme Court has explained that such "secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham,* 383 U.S. at 17-18. It is the patentee's burden to establish secondary considerations. *See WMS Gaming, Inc. v. Intl. Game*

*Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999). Fujitsu did not present any evidence of commercial success, industry skepticism, or any other secondary considerations at trial. Nor did it argue to the jury that any such considerations demonstrated that the claimed invention truly was inventive. The *prima facie* case of obviousness therefore stands unrebutted.

\* \* \*

The combination of the July 1995 Sugaya Article and the '874 patent discloses every element of asserted claim 6 of the '681 patent and renders claim 6 invalid as obvious. (A17231-32(985:21-986:2); A17233-34(987:3-988:8).) The district court's determination that a reasonable jury could conclude that the July 1995 Sugaya Article did not disclose an optical amplifier that amplifies an optical signal "having a variable number of channels associated with different wavelengths" and includes a controller that "controls the gain to be approximately constant" was erroneous. The amplifier disclosed in the Article is used to amplify a WDM optical signal with an inherent variability in the number of channels and was expressly designed for use in an OXC system where switching the optical paths of the light will result in variation in the number of channels. (A16986(741:3-11); A17193(947:13-20); A17404-05(1157:16-1158:2).) The July 1995 Sugaya Article therefore discloses an amplifier capable of amplifying a WDM optical signal in a variable channel count environment and includes the

same AGC controller disclosed in the '681 patent to "control[ ] the gain to be approximately constant." Claim 6 is obvious in view of the July 1995 Sugaya Article in combination with the '874 patent, and judgment as a matter of law is appropriate.

### B. Claim 7 is Obvious in View of the July 1995 Sugaya Article and the '874 Patent.

The July 1995 Sugaya Article discloses a "controller [which] controls the gain to be approximately constant during variation of the number of channels in the WDM optical [signal]," as required by claim 7 of the '681 patent. (A346(22:47-49).) As noted above, an automatic gain control circuit is designed to keep the gain approximately constant despite changes in input power and regardless of the cause of the changes. (*See supra* at 48-49.) Because one cause of a change in input power is a change in the number of channels, the controller disclosed in the July 1995 Sugaya Article will control the gain to be approximately constant during variation in the number of channels in a WDM optical signal. (A15364; A16986(741:3-11); A17188-89(942:23-943:5); A17193(947:2-9, 13-20); A17198(952:14-23).)

Because this is the only element that claim 7 adds to claim 6, claim 7 is invalid as obvious in view of the combination of the July 1995 Sugaya Article and the '874 patent.

### C. Claim 8 is Obvious in View of the July 1995 Sugaya Article and the '874 Patent.

The July 1995 Sugaya Article discloses an optical attenuator, "wherein an attenuation level of the optical attenuator is changed to control the level of the amplified WDM optical signal," as required by claim 8 of the '681 patent. (A346(22:50-52).) As noted above, the July 1995 Sugaya Article discloses an optical attenuator that controls a level of the amplified WDM optical signal. (*See supra* at 50-51.) Specifically, Figure 5 of the Article illustrates this optical attenuator. (A15365(Fig. 5); A17197(951:4-11); A17275(1028:4-11); *see also* A15367(Fig. 6).)

The Article further discloses that the optical attenuator is controlled by an automatic level control (ALC) circuit. (A15358(Abstract); A15364-66; A15365(Fig. 5).) The Article discloses that the attenuation level of the optical attenuator is changed to control the level of the amplified WDM optical signal. (A15358(Abstract); A15364-66; A15365(Fig. 5); A15367(Fig. 6) (the diagonal line through the box marked "ATT" indicates that the attenuation level of the attenuator can be varied); A16955(710:11-15); A17194-95(948:20-949:9)).)

Because this is the only element that claim 8 adds to claim 6, claim 8 is invalid as obvious in view of the combination of the July 1995 Sugaya Article and the '874 patent, and judgment as a matter of law is appropriate.

58

IV. **Fujitsu Improperly Imported the Attenuator Freezing Feature From the '681 Patent's Specification Into the Gain Control Function Recited in the Claims.**

A. **The Claims of the '681 Patent Do Not Require or Include Freezing the Optical Attenuator as Part of the Recited Gain Control Function.**

As explained above (p. 14), the '681 patent specification describes an optical amplification system that keeps the power per channel constant by freezing the operation of an optical attenuator when it detects a control signal indicating a change in the number of channels. (A339(7:55-8:31); A334(Fig. 28); *see also* A336(1:35-39); A337(3:11-31).) The claims of the '681 patent, however, do not require freezing the optical attenuator as part of the claimed gain control function.

According to the express language of claim 6, the recited optical attenuator does not control the gain provided by the amplifier—the optical attenuator recited by claim 6 only "controls a level of the *amplified* WDM optical signal." (A346(22:41-42) (emphasis added).) In other words, the optical attenuator controls the level of a WDM optical signal that has already been "amplifie[d]…with a gain." The optical attenuator of claim 6 therefore does not contribute to the "gain" recited in the claim because the optical attenuator operates on "the *amplified* WDM optical signal," which, by definition, already includes the recited gain.

59

This conclusion is consistent with how claim 6 uses the term "gain." In claim 6, gain is a result of amplification. This is expressed in the claim language: "an optical amplifier which amplifies…with a gain…." (A346(22:36-39).) An attenuator, however, cannot amplify an optical signal:

> Q: Do you recall that Dr. Buckman testified today that the variable optical attenuator can only remove power?
>
> A: Yes.
>
> Q: Do you agree?
>
> A: As an element by itself, it can only remove power.

(A17484(1237:20-24) (testimony of Fujitsu's expert, Dr. Willner).) By definition, an attenuator attenuates, causing loss, not gain. (A15404(3:64-4:20); A15405(6:33-35) (attenuators cause attenuation).)

Therefore, when claim 6 refers to "gain" in the element "a controller which controls the gain to be approximately constant," it is referring to the gain provided by the light amplification medium, such as an Er-doped fiber, and it does not include any loss, *i.e.*, attenuation, caused by the optical attenuator. In other words, the gain that must be held approximately constant is the gain across the light amplification medium – the Er-doped fiber.

This conclusion is further supported by the fact that claim 6 recites no functional connection between the gain controller and the optical attenuator. "Because the patentee is required to define precisely what his invention is. . . , it is

60

unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *White v. Dunbar*, 119 U.S. 47, 52 (1886)) (internal quotations omitted).  A functional linkage would be expected if the optical attenuator were involved in controlling the gain.   The fact that claim 6 omits any reference to gain when reciting the "optical attenuator" element and omits any reference to the optical attenuator when reciting the "controller" element demonstrates that the claim does not require the optical attenuator to be involved in controlling gain.

It is well settled that courts must construe the claims as written and cannot redraft the claims to preserve validity or to cover the invention described in the specification.  *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004); *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002).  Here, the claims as written do not require freezing the optical attenuator and do not include the optical attenuator in controlling the gain.

**B.    Fujitsu Improperly Distinguished the Prior Art Based on the Fact that the Prior Art Did Not Freeze the Optical Attenuator When the Number of Channels Changed.**

Despite the fact that the optical attenuator is not involved in the gain control function recited in the asserted claims of the '681 patent, at trial and in response to Tellabs' motion for judgment as a matter of law, Fujitsu repeatedly attempted to

distinguish the '681 patent invention from the prior art through testimony

explaining that prior art amplification systems did not freeze the optical attenuator

when the number of channels changed.  For example, Fujitsu relied on the

testimony of Mr. Sugaya for the proposition that the optical amplification system

of the '092 patent would not hold the overall gain constant when the input power

changes.  (*See* A17852-53.)  Mr. Sugaya testified that changes in the transmissivity

of an optical attenuator, as would occur in the prior art, "cause the *amplifier*

*overall gain* to change." (A16873-74(629:22-630:4) (emphasis added).)  Fujitsu

used the term "amplifier overall gain" specifically to include the contribution of

the optical attenuator (*see*, *e.g.*, A16683(440:13-17) (argument by Fujitsu's expert,

Dr. Willner, that the optical attenuator contributes to "the gain of your overall

amplifier"); A17368-69(1121:3-1122:1) (cross-examination of Tellabs' expert, Dr.

Buckman, about "the gain of the overall amplifier")).

Fujitsu also relied on its expert, Dr. Willner, who argued that the attenuator

in the invention of the '681 patent claims must be frozen and that the prior art

system of the '092 patent would "erroneously change the gain" by continuing to

adjust the attenuation of an optical attenuator that was not frozen.  (A17853.)

However, the question posed to Dr. Willner defined "the gain of Claim 6 being the

gain of the overall amplifier" (A17853 (citing question and answer at

A17466(1219:13-21))), and Dr. Willner defined "the gain of your overall

62

amplifier" to include a contribution of the optical attenuator (A16683(440:13-17); A17467(1220:5-17)).  Thus, Dr. Willner erroneously argued that "gain is controlled through the variable optical attenuator."  (A17449-50(1202:21-1203:2).)

Fujitsu further relied on a statement by Tellabs' expert, Dr. Buckman, that "[t]he gain across the entire amplifier in the '092 Patent will change when the number of channels changes."  (A17854 (citing testimony at A17414(1167:4-14)).) But Dr. Buckman was referring to "overall gain" (A17414(1167:10-14)), a concept that Fujitsu previously defined to include the contribution of the variable optical attenuator (*see* A17412(1165:19-25)).

Fujitsu made similar arguments with respect to the July 1995 Sugaya Article.  For example, Fujitsu relied on testimony by Mr. Sugaya and Dr. Willner that equated the optical amplification system of the Article with the optical amplification system of the '092 patent.  (A17863-64.)  Fujitsu also relied on testimony from Dr. Buckman stating that the amplification system of the Article lacked circuitry to keep "overall gain" or "gain across the entire apparatus" constant.  (A17865.)

Thus, the analysis presented by Fujitsu was legally flawed.  The asserted claims of the '681 patent do not require the optical attenuator to be involved in or contribute to the gain control function of the controller, nor do they require gain to be constant across the entire apparatus.  Rather, independent claim 6 requires the

Er-doped fiber to amplify "a [WDM] optical signal . . . with a gain," a controller that "controls the gain to be approximately constant," and an attenuator that "controls a level of the *amplified* [past tense] WDM optical signal." (A346(22:35-46) (emphasis added).)

By including the contribution of the optical attenuator in its analysis of gain control, Fujitsu was able, incorrectly, to argue that changing the transmissivity of the optical attenuator in the prior art systems changes the gain and, thus, the optical attenuator must be frozen as described in the *specification* of the '681 patent to keep the gain constant. These arguments directly contradict the plain language of the *claims* which (a) do not connect the optical attenuator to the gain control function and (b) do not include the contribution of the optical attenuator in the gain applied to the WDM optical signal.

Based on this legally flawed analysis, Fujitsu argued that the prior art disclosed only fixed channel count amplifiers (*see* A17853-55; A17862-64), which were "not designed to differentiate for input power fluctuations caused by changes in channel count" (*see* A17853-54; A17864 (citing testimony by Dr. Buckman)). But this argument also fails because the claims of the '681 patent do not require differentiation of input power fluctuations caused by changes in channel count. Indeed, the claims do not recite any element – such as the monitor signal

processing circuit described in the specification – that provides the ability to differentiate for input power fluctuations caused by changes in channel count.

All of the evidence cited by Fujitsu is legally irrelevant because the claims of the '681 patent merely recite common elements of the prior art optical amplification systems and then state that the claimed system amplifies a WDM optical signal "having a variable number of channels." Such a claim is not patentable. *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997) ("It is well settled that the recitation of a new intended use for an old product does not make a claim to that old product patentable."); *Pearson*, 494 F.2d at 1403 ("These terms merely set forth the intended use for, or a property inherent in, an otherwise old composition. As the board pointed out, such terms do not differentiate the claimed composition from those known to the prior art."); *In re Sinex*, 309 F.2d 488, 492 (C.C.P.A. 1962) (A statement of intended use "does not qualify or distinguish the structural apparatus claimed over the reference."). Moreover, it is undisputed that the amplification systems of the prior art amplified a WDM optical signal and that the number of channels in a WDM signal inherently varies. Accordingly, none of the evidence or arguments supplied by Fujitsu could provide a sufficient legal basis for the jury verdict.

## C. The District Court Erred by Denying Judgment as a Matter of Law Based on Fujitsu's Improper Arguments.

In denying Tellabs' motion for judgment as a matter of law, the district court incorrectly relied upon the erroneous testimony and arguments of Fujitsu. For example, the district court accepted testimony that the prior art amplifiers were designed for use in a fixed channel count environment. But, a new recited use cannot make a claim covering the prior art patentable. *Schreiber*, 128 F.3d at 1477; *Pearson*, 494 F.2d at 1403; *Sinex*, 309 F.2d at 492.

The district court also incorrectly relied on testimony directed to features not recited in the claims. For example, the district court relied on testimony that distinguished the asserted claims of the '681 patent based upon the failure of prior art systems to differentiate for input power fluctuations caused by changes in channel count and to freeze the optical attenuator when the number of channels changes. (A13-14, A16-17.) In doing so, the district court also erroneously analyzed the gain control of the prior art systems in terms of "overall gain," which includes the contribution of the optical attenuator. Thus, the district court erred because the claims of the '681 patent do not refer to "overall gain" and do not require the optical attenuator to contribute to the gain applied to the WDM optical signal.

The district court also erred by focusing solely on what happens to the overall gain at the moment that the number of channels changes. Unlike claim 7,

which requires gain to be held constant "during variation of the number of channels," neither claim 6 nor claim 8 recites a specific time or event during which gain must be held constant. (A346(22:35-46, 50-52).)

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed. The asserted claims should be declared invalid as anticipated by the '092 patent and/or obvious in view of the July 1995 Sugaya Article in combination with the '874 patent.

Dated: June 10, 2013.                    Respectfully submitted,

                                         /s/ Constantine L. Trela, Jr.
                                         Constantine L. Trela, Jr.
                                         **SIDLEY AUSTIN LLP**
                                         One South Dearborn Street
                                         Chicago, Illinois  60603
                                         Telephone:  312.853.7000
                                         Facsimile:   312.853.7036

                                         James P. Bradley
                                         Mark A. Dodd
                                         Kristoffer B. Leftwich
                                         Kelley A. Conaty
                                         Benjamin B. Kelly
                                         **SIDLEY AUSTIN LLP**
                                         717 North Harwood
                                         Suite 3400
                                         Dallas, Texas 75201
                                         Telephone:  214.981.3300
                                         Facsimile:   214.981.3400

                                         **ATTORNEYS FOR
                                         TELLABS OPERATIONS, INC., TELLABS, INC.,
                                         AND TELLABS NORTH AMERICA**

CASE PARTICIPANTS ONLY Document: 22 Page: 79 Filed: 06/10/2013

**Addendum**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FUJITSU LIMITED, | ) | |
| | ) | |
| Counterclaimant, | ) | |
| v. | ) | No. 08 C 3379 |
| | ) | No. 09 C 4530 |
| TELLABS OPERATIONS, INC., | ) | |
| TELLABS INC., and TELLABS | ) | |
| NORTH AMERICA, INC., | ) | |
| | ) | |
| Counterdefendants. | ) | |

MEMORANDUM OPINION AND ORDER
DENYING PARTIES' RESPECTIVE REQUESTS FOR JUDGMENT AS A MATTER OF
LAW AND DENYING FUJITSU LIMITED'S REQUEST FOR A NEW TRIAL
REGARDING FUJITSU LIMITED'S '681 PATENT

JAMES F. HOLDERMAN, Chief Judge:

Counterclaimant Fujitsu Limited alleged in this lawsuit that Tellabs Operations, Inc.,

Tellabs, Inc., and Tellabs North America, Inc. (collectively "Tellabs") infringed Claims 6, 7, and

8 of Fujitsu Limited's U.S. Patent No. 7,227,681 (the "'681 Patent") by making or selling

Tellabs' Metro Input Amplifier Module (the "MIAM module") product. Tellabs in response

asserted that the '681 Patent was invalid by reason of anticipation and obviousness. At the close

of a nine-day jury trial, the jury returned a verdict on September 7, 2012 of non-infringement for

each of the asserted claims, and upheld the '681 Patent as unanticipated and non-obvious.

Pending before the court are "Fujitsu's Renewed Motion for Judgment as a Matter of

Law that Tellabs Infringes Claims 6, 7, and 8 of U.S. Patent No. 7,228,681, Notwithstanding the

Jury Verdict of Non-Infringement; or, Alternatively Motion for a New Trial" (Case No. 09 C

4530, Dkt. No. 962) and "Tellabs, Inc.'s, Tellabs Operations, Inc.'s, and Tellabs North America,

1

A1

Inc.'s Renewed Motion for Judgment as a Matter of Law that U.S. Patent No. 7,227,681 Is Invalid" (Case No. 08 C 3379, Dkt. No. 566). For the reasons that follow below, both motions are denied.

BACKGROUND

The '681 Patent issued on June 5, 2007, and is titled "Controller Which Controls a Variable Optical Attenuator to Control the Power Level of a Wavelength-Multiplexed Optical Signal When the Number of Channels Are Varied." ('681 Patent (Joint Ex. 2000) at (54).) Yasushi Sugaya and Susumu Kinoshita are the named inventors on the '681 Patent, and Fujitsu Limited is the assignee. ('681 Patent at (75), (73).)

The '681 Patent "relates to a fiber optic communication system which uses wavelength division multiplexing to transmit a wavelength-multiplexed optical signal." ('681 Patent, col. 1:33-35.) "Wavelength division multiplexing" is method of combining multiple channels of information having different individual wavelengths into one wavelength-multiplexed optical signal. (*See generally* '681 Patent, col. 1:44-65.) In fiber optic communication systems using wavelength division multiplexing, an optical amplifier is used "to amplify the wavelength-multiplexed optical signal traveling through [the] optical fiber." ('681 Patent, col. 1:66-67; col. 2:1-3.) This amplification or increase in power is known as "gain." (Case No. 08 C 3379, Dkt. No. 234 ("9/23/09 Tech. Tutorial Tr.") at 66:21-25; Case No. 08 C 3379, Dkt. No. 287 ("2/23/10 Tech. Tutorial Tr.") at 450:5-6.)

As this court explained in its September 29, 2011 claim construction opinion:

The '681 Patent is directed to the ability to control the gain of the optical amplifier depending on the number of wavelength division multiplexed channels that are input into the amplifier. (2/23/10 Tech. Tutorial Tr. 466:22–25.) As the number of wavelength channels entering the amplifier from the network changes, the required

2

A2

gain also changes. (*Id.* at 470:11–24.) For example, if the number of channels entering the amplifier decreases, less gain is needed, and the amplifier would decrease the amount of pump power. (*Id.*)

Relatedly, each wavelength amplified in the optical amplifier receives a different amount of gain depending on the wavelength. (*Id.* at 472:3–473:16.) The '681 Patent discloses introducing a loss element, such as a filter, that would equalize the gain across the wavelengths. (*Id.*)

*Fujitsu Ltd. v. Tellabs Operations, Inc.*, 821 F. Supp. 2d 1009, 1054 (N.D. Ill. 2011).

Fujitsu Limited asserted three claims of the '681 Patent at trial: Claim 6, Claim 7, and

Claim 8. The asserted claims of the '681 Patent read as follows, with the court's claim

interpretations of the italicized terms inserted in brackets:

**6.** An apparatus comprising:

an optical amplifier which amplifies a wavelength division multiplexed (WDM) optical signal *having a variable number of channels associated with different wavelengths* [the number of channels can change and each channel is associated with a different wavelength] with a gain and outputs the amplified WDM optical signal, the optical amplifier including:

an *optical attenuator* [a device having variable optical transmissivity] which controls a level of the amplified WDM optical signal,

an optical filter *making* [which makes][1] the gain *substantially even* [largely but not wholly even] with respect to said different wavelengths, and

a controller which controls the gain the be *approximately constant* [nearly constant or constant].

**7.** An apparatus as in claim **6**, wherein the controller controls the gain to be *approximately constant* [nearly constant or constant] *during variation of the number of channels in the WDM optical signal* [while the number of channels in the WDM optical signal changes].

**8.** An apparatus as in claim **6**, wherein an attenuation level of the *optical attenuator* [a

---

[1] Pursuant to a Certificate of Correction issued by the PTO on October 13, 2007, the word "makes" in Claim 6 was changed to "making." ('681 Patent, col. 22:43.)

device having variable optical transmissivity] is changed to control a level of the amplified WDM optical signal.

As stated above, the accused device in this case is Tellabs' MIAM module product. Specifically, Fujitsu Limited alleged that Tellabs' MIAM module product is an apparatus comprising an "optical amplifier" as described in Claims 6, 7, and 8 of the '681 Patent. Relevant to the controller element of all three asserted claims, it is undisputed that the MIAM module product incorporates an optical gain block manufactured by a company named RED-C Optical Networks, Ltd. ("RED-C"), and that RED-C also designed the gain-control algorithm used by the optical gain block.

Fujitsu Limited presented several witnesses in its case-in-chief, including: Mr. Yasushi Sugaya, one of the inventors of the '681 Patent; Dr. Uri Ghera, the head of research and development at RED-C; and Dr. Alan Willner, Fujitsu Limited's expert witness. Mr. Sugaya's testimony focused on the amplifier technology described by the '681 Patent; Dr. Ghera's testimony focused on the components used in, and the operation of, the MIAM module product; and Dr. Willner's testimony focused on general optical amplifier principles and Dr. Willner's expert opinion that Tellabs' MIAM module product infringed the asserted claims of the '681 Patent. Fujitsu Limited also offered into evidence, among other exhibits, a document titled "Hardware Requirements Specification TELLABS 7100 E-OGB for Amplifier Modules," setting forth Tellabs' hardware specifications for its optical amplifier products. (Fujitsu Ex. 2012.)

Tellabs denied that its MIAM module product infringed the asserted claims of the '681 Patent and further alleged that the '681 Patent was invalid as both anticipated and obvious. Tellabs relied primarily on its expert witness, Dr. A. Bruce Buckman, to support its theories of non-infringement and invalidity. Tellabs also offered into evidence three items of admitted prior

4

art in support of its invalidity claim. With respect to anticipation, Tellabs presented U.S. Patent

No. 6,055,092 (the "'092 Patent"), titled "Multi-Wavelength Light Amplifier." (Tellabs Ex. DX-

134.) The '092 Patent was filed on May 28, 1996, and lists Mr. Sugaya as a named inventor.

('092 Patent at [22], [75].) Fujitsu Limited is the assignee of the '092 Patent. ('092 Patent at

[73].) With respect to obviousness, Tellabs presented an article published in July of 1995 by the

Institute of Electronics, Information and Communication Engineers, *Configuration Design of

Multi-Wavelength Er-Doped Fiber Amplifier for WDM Transmission System*, Technical Report

of IEICE OCS95-96 (1995-07), written in part by Mr. Sugaya (the "July 1995 Sugaya Article")

(Tellabs Ex. DX-031), as well as U.S. Patent No. 5,083,874 (the "'874 Patent"), titled "Optical

Repeater and Optical Network Using the Same" and filed on April 10, 1990 (Tellabs Ex. DX-

029 at [22]).

During Fujitsu Limited's rebuttal case, Dr. Willner provided his expert opinion that the

'681 Patent was not anticipated by the '092 Patent or rendered obvious by the July 1995 Sugaya

Article in combination with the '874 Patent.

The jury deliberated for three days before returning its verdict that the '681 Patent was

not invalid and was not infringed.

Notwithstanding the jury's verdict, Fujitsu Limited requests that this court enter

judgment as a matter of law that the '681 Patent was infringed by Tellabs and, in the alternative,

requests a new trial on the merits. Tellabs requests that this court enter judgment as a matter of

law that the '681 Patent is invalid as anticipated or obvious.

## LEGAL STANDARD

Judgment as a matter of law is appropriate as to a particular issue when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). "The district court may not resolve any conflicts in the testimony nor weigh the evidence, except to the extent of determining whether substantial evidence could support a jury verdict: '[A] mere scintilla of evidence will not suffice.'" *Lane v. Hardee's Food Sys., Inc.*, 184 F.3d 705, 707 (7th Cir. 1999) (quoting *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1410 (7th Cir.1984)).[2] In deciding a motion for judgment as a matter of law, "the court should review all of the evidence in the record" and "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). A jury's verdict will be overturned only if it is determined that no rational jury could have found for the non-moving party. *Waite v. Bd. of Trustees of Ill. Cmty. Coll. Dist. No. 508*, 408 F.3d 339, 343 (7th Cir. 2005); *see also Lebow v. Am. Trans Air, Inc.*, 86 F.3d 661, 664 (7th Cir. 1996) (judgment as a matter of law appropriate "only if there can be but one conclusion from evidence and inferences reasonably drawn therefrom") (internal quotation marks and citation omitted).

Motions for new trials under Rule 59(a) are addressed to the discretion of the district court, and the "district court must determine whether the verdict was against the manifest weight

---

[2] Although this is a patent case, Seventh Circuit law governs the court's analysis as to the parties' post-trial motions. *See Pregis Corp. v. Kappos*, 700 F.3d 1348, 1353 (Fed. Cir. 2012) (reviewing "the grant or denial of a motion for judgment as a matter of law under regional circuit law"); *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1323 (Fed. Cir. 2003) ("[o]n motions for a new trial we apply the law of the regional circuit").

6

of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Frizzell v. Szabo*, 647 F.3d 698, 702 (7th Cir. 2011). The jury's verdict should be set aside as contrary to the manifest weight of the evidence only if "no rational jury" could have rendered the verdict. *Moore v. Tuleja*, 546 F.3d 423, 427 (7th Cir. 2008).

<u>ANALYSIS</u>

The first order of business is to determine whether Fujitsu Limited has properly presented its motion. Tellabs argues that Fujitsu Limited's motion should not be considered by this court because it is untimely. Fujitsu Limited made an oral Rule 50(a) motion at the close of Tellabs' case-in-chief on September 4, 2012. Fujitsu Limited also requested, without objection by Tellabs, that it be allowed until September 10, 2012 to file an accompanying written motion, and this request was granted. On September 5, 2012, Tellabs was also given until September 10, 2012 to file its written motion for judgment as a matter of law. On September 7, 2012 the jury returned its verdict. At that time Fujitsu Limited was granted, without objection, until October 5, 2012, to file its written motion for judgment as a matter of law, along with its other motions for post-trial relief. Fujitsu Limited therefore did not submit a written motion for judgment as a matter of law until October 5, 2012, twenty-eight days after the jury returned its verdict.

Although Fujitsu Limited's September 4, 2012 oral motion did not "specify the judgment sought and the law and facts that entitle the movant to the judgment," Fed. R. Civ. P. 50(a)(2), and Fujitsu Limited's Octover 5, 2012 written motion was not filed "before the case [was] submitted to the jury," *id.*, Tellabs made no objection at the time Fujitsu Limited sought an extension, and is not prejudiced by Fujitsu Limited's late filing. *See Leader Tech, Inc. v. Facebook, Inc.*, 770 F. Supp. 2d 686, 715 (D. Del. 2011) ("to the extent there is any doubt as to

7

A7

whether Leader's oral pre-verdict Rule 50(a) motion was sufficiently specific, those doubts are erased by Leader's subsequent filing of its written Rule 50(a) motion, which was filed consistent with the timing allowed by the Court"). Fujitsu Limited's renewed motion for judgment as a matter of law is properly before this court, and the court will address the merits of the parties' respective motions.

      1.   <u>Fujitsu Limited's Renewed Motion for Judgment as a Matter of Law and Alternative Motion for a New Trial</u>

Both parties agree that the success of Fujitsu Limited's infringement contentions at trial depended on whether Fujitsu Limited proved by a preponderance of the evidence that Tellabs' MIAM module product includes "a controller which controls the gain to be approximately constant." (*See* Case No. 09 C 4530, Dkt. No. 962 ("Fujitsu's JMOL") at 3 ("The sole missing claim element disputed by Dr. Buckman was the 'controller which controls the gain to be approximately constant.'"); *see also* Case No. 09 C 4530, Dkt. No. 974 ("Tellabs' Resp." at 9 ("Specifically, the Tellabs Defendants and Dr. Buckman established that the accused MIAM module does not include the controller required by each of the asserted claims ….")). In light of the substantial evidence of non-infringement presented to the jury in this case, Fujitsu Limited's motion for judgment as a matter of law on the question of infringement is denied.

As recognized by Fujitsu Limited, Dr. Buckman testified at trial that a person of ordinary skill in the art would understand Claim 6 to require an optical amplifier to hold the gain approximately constant before, during, and after a change in the number of channels. (Fujitsu's JMOL at 10 (citing Trial Tr. 1049:23-1052:15)).[3] Dr. Buckman further testified that the MIAM

---

    [3] Dr. Buckman also testified that dependent Claim 7 recited "a more limited time period or particular time period" than independent Claim 6, but that "the time period where the

module product allowed for a ± 0.8 dB "maximum excursion" in the gain during a change in the number of channels, which was "a little over three times" the "steady state gain error band" allowed when the number of channels was not changing. (Trial Tr. at 834:13-19; *see generally* Trial Tr. 822-834.)

Dr. Buckman illustrated the MIAM module product's response during a change in the number of channels using Fujitsu Exhibit 2012 — a Tellabs-authored technical specification document originally introduced into evidence at trial by Fujitsu Limited. (*See* Fujitsu Ex. 2012 at 2012-14 (Fig. 4) & 2012-15 (Table 1)). Dr. Buckman concluded from this evidence that "the gain is not kept constant" in the MIAM module product during a change in the number of channels. (Trial Tr. 836:7-17). No other evidence of the MIAM module product's response characteristics during an actual change in the number of channels was introduced by either party at trial.

Fujitsu Limited argues that it is nevertheless entitled to judgment as a matter of law on its infringement claims, because "Dr. Buckman's theory did not withstand cross-examination." (Fujitsu's JMOL at 13.) Fujitsu Limited's argument rests on (1) Dr. Buckman's testimony on cross examination that the ± 0.8 dB maximum excursion in the gain during a change in the number of channels represents the MIAM module product's reaction to a "fiber cut event" in

---

controller is supposed to keep the gain constant always at least includes, and most of the time surrounds on either side, the period of time where the number of channels is actually changing." (Trial Tr. at 836:21-22; 839:11-14.) Fujitsu Limited appears to agree with Dr. Buckman's testimony on this point, asserting in its pending motion that the gain in Claim 6 is held constant "for an interval related to a variation in the number of channels in the optical signal input to the MIAM optical amplifier." (Fujitsu's JMOL at 10 (citing Dr. Buckman's testimony in support).) Neither party distinguishes dependent Claims 7 and 8 from independent Claim 6 in this regard, and the court's analysis therefore applies equally to all three asserted claims of the '681 Patent.

9

which all channels but one are suddenly dropped, and Dr. Buckman's follow-up testimony that he "would expect that [the excursion] wouldn't be as high" if fewer channels were dropped in the "normal" course of operation (Trial Tr. at 1088:4-1092:10; *see also* Fujitsu Ex. 2012 at 2012-13 & 2012-14); (2) Dr. Buckman's testimony on cross examination that the ± 0.8 dB maximum excursion in the gain during a change in the number of channels is only 1/15th the size of a standard 12 dB signal and lasts for only 1/5,000th of a second (Trial Tr. at 1092:11-1096:20; 1099:24-1102:3); and (3) Dr. Buckman's testimony on cross examination acknowledging that Tellabs' specifications state that the design function of the Automatic Gain Control ("AGC") circuit in Tellabs' optical amplifiers is to "ensure[ ] constant gain of the amplifier during quick change in the power level of the DWDM signal" (Trial Tr. at 1102:17-1104-18; *see also* Fujitsu Ex. 2012 at 2012-14 (Fig. 4) & 2012-28 (Section 5.10.2)).

While Fujitsu Limited's cross examination of Dr. Buckman's testimony may have been damaging, deciding what weight to give Dr. Buckman's testimony is a task for the jury. *See E.E.O.C. v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422 (7th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are within the province of the jury.") (quoting *Bogan v. City of Chicago*, 644 F.3d 563, 572 (7th Cir. 2011)). This court may not, and will not, substitute its own assessment of Dr. Buckman's testimony in place of the jury's.

The court also rejects Fujitsu Limited's argument that Dr. Buckman's testimony was impermissibly based on "unusual conditions." (Fujitsu's JMOL at 15 (citing *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001)).) Dr. Buckman's opinion was based on an anticipated "fiber cut event" specifically addressed in Tellabs' specifications, and was in that

10

sense clearly "relevant to the infringement analysis" regarding the MIAM module product's standard operation under those anticipated conditions.  *Hilgraeve Corp.*, 265 F.3d at 1343.

Fujitsu Limited further relies on Dr. Ghera's testimony that the RED-C optical gain block component was designed to react "fast enough" to "keep the gain constant" during a change in the number of channels, (Fujitsu's JMOL, Ex. 2 ("Ghera Dep. Tr.") at 162:1-17), arguing that this "uncontroverted factual testimony" demonstrates that the MIAM module product actually keeps the gain constant during a change in the number of channels.  (Fujitsu's JMOL at 19.)  A reasonable jury, however, could have rejected Fujitsu Limited's interpretation of Dr. Ghera's testimony in favor of Dr. Buckman's interpretation of Dr. Ghera's testimony—that Dr. Ghera was addressing "the speed with which the controller *corrects* the gain when something happens, such as a change in the number of channels which wants to take it out of its range where it's supposed to be constant."  (Trial Tr. at 1152:2-7 (emphasis added).)

The court need not address Fujitsu Limited's additional arguments regarding Tellabs' alternative theories of non-infringement.  Based on Dr. Buckman's testimony as to the ± 0.8 dB maximum excursion in the gain during a change in the number of channels, the court finds that a legally sufficient evidentiary basis was presented at the trial for a reasonable jury to conclude that Tellabs' MIAM module product does not include "a controller which controls the gain to be approximately constant" during a change in the number of channels, as required by independent Claim 6 and dependent Claims 7 and 8.  Fujitsu Limited's renewed motion for judgment as a matter of law is therefore denied.

Fujitsu Limited argues, in the alternative, for a new trial on the issue of infringement. (Fujitsu's JMOL at 25.)  This request for a new trial is denied.  As discussed above, Tellabs

11

introduced evidence at trail that, in response to a change in the number of channels, the gain supplied by the MIAM module product would deviate from the desired value, resulting in a ± 0.8 dB "maximum excursion" in the gain before the control systems of the MIAM module product regulated the gain to the desired steady state value. This ± 0.8 dB excursion directly relates to the patent element requiring that a controller control the gain to be approximately constant. A rational jury could have, in light of this evidence and the other evidence presented at trial, determined that the MIAM module product did not maintain an approximately constant gain as required in Claims 6, 7, and 8 of the '681 Patent. The jury's determination is not against the manifest weight of the evidence, and Fujitsu Limited's request for a new trial is denied.

      2.    <u>Tellabs' Motion for Judgment as a Matter of Law</u>

The court also rejects Tellabs' contention that a judgment of invalidity is required as a matter of law for Claims 6, 7, and 8 of the '681 Patent. As noted above, Tellabs argued to the jury that the '681 Patent is anticipated by the '092 Patent. In support of its anticipation argument, in relevant part, Tellabs introduced evidence that the '092 Patent inherently disclosed a variable channel count environment, as required by Claims 6, 7, and 8 of the '681 Patent. (*See* Claim 6 ('681 Patent, col. 22:36-39) (describing "an optical amplifier . . . having a variable number of channels associated with different wavelengths [the number of channels can change and each channel is associated with a different wavelength]") (as modified by 9/29/2011 claim construction).) Specifically, Dr. Buckman testified, "[I]t's my opinion based on common sense that the number of channels in a [wavelength division multiplexed] optical system is going to inherently vary," because the "laser source[s] somewhere in the system . . . eventually and randomly, probably unexpected, are going to die. They're going to quit operating and when they

do that, that channel's gone. The number of channels has changed." (Trial Tr. at 880:19-

881:14.) Dr. Buckman further testified that a person of ordinary skill in the art, as defined by the

court, would understand that any component is "eventually going to fail . . . and, in the case of a

laser, stop producing the light it's supposed to produce which would cause the number of

channels on a particular communications line to change when that happens." (Trial Tr. at

882:20-883:2.) Through Dr. Buckman, Tellabs also introduced statements made by PTO

examiner Deandra Hughes during the prosecution of a patent related to the '681 Patent, in which

Hughes stated in an official Office Action that with respect to the '092 Patent "the number of

channels is inherently variable because channels are inherently dropped." (DX-025-3; *see*

*generally* Trail Tr. 918:19-923:21.) Based on this evidence, Tellabs argues it proved at trial that

"a person of ordinary skill in the art would have known that an optical fiber transmission system

inherently adds and drops wavelength channels from the wavelength division multiplexed

(WDM) optical signal at a node in the system." (*See* Dkt. No. 566 ("Tellabs' JMOL") at 5.)

In response, Fujitsu Limited argues that the trial testimony of Mr. Sugaya, Dr. Willner,

and Dr. Buckman suggests "a consensus . . . that the optical amplifier disclosed in the '092

Patent . . . cannot work in a variable channel count environment." (Dkt. No. 568 ("Fujitsu's

Resp.") at 21.) As an inventor of both the '681 Patent and the '092 Patent, Mr. Sugaya testified

that the optical amplifier disclosed in the '092 Patent "operates in an environment in which the

number of channels doesn't change." (Trial Tr. at 613:17-20.) Mr. Sugaya further testified that

if the number of channels were to change, "the amount of power per channel drops [with respect

to the optical amplifier disclosed in the '092 Patent] . . . mean[ing] that the quality of

communications will be degraded, and so problems like not being able to communicate will

13

occur." (Trial Tr. at 628:23-629:3 (referring to Fujitsu Illustrative Ex. 2614).) Specifically, Mr.

Sugaya testified that in a changing channel count environment, the attenuator in the '092 Patent

changes, causing "the amplifier overall gain to change." (Trial Tr. at 625:8-11; 629:25-630:3.)

Mr. Sugaya testified that the invention disclosed in the '681 Patent was designed to address these

concerns. (Trial Tr. at 630:1-4.) Similarly, Dr. Willner testified that "[a] fixed-channel count

amplifier, such as the '092 patent, would erroneously change the gain, adjust the attenuation of

the variable optical attenuator when the number of channels is changing." (Trial Tr. at

1219:13-21.) On cross examination, Dr. Buckman testified that there was "[n]o explicit

disclosure of variable channel count" in the '092 Patent, and he agreed with counsel's statement

that the '092 Patent was "not designed to differentiate for input power fluctuations caused by

changes in channel count." (Trial Tr. at 1123:21-23; 1129:19-25.) Dr. Buckman further testified

that "[t]he gain across the entire amplifier in the '092 Patent will change when the number of

channels changes." (Trial Tr. at 1167:4-9.)

　　　As stated earlier in this memorandum opinion, it is not for the court in ruling on post-trial

motions to resolve conflicts in trial testimony or weigh the evidence. In accordance with Rule

50(a), the court finds that a reasonable jury considering the testimony of Mr. Sugaya, Dr.

Willner, and Dr. Buckman had a legally sufficient evidentiary basis to conclude that the '092

Patent did not anticipate the asserted claims of the '681 Patent, because the '092 Patent did not

disclose an optical amplifier "having a variable number of channels associated with different

wavelengths," including a component that "controls the gain to be approximately constant," as

required by the asserted claims of the '681 Patent. In light of this finding, the court need not

address Tellabs' additional arguments regarding anticipation by the '092 Patent.

14

Finally, the court addresses Tellabs' request for judgment that the '681 Patent is invalid as a matter of law due to obviousness. As presented at trial, Tellabs' obviousness argument focused on the combination of the July 1995 Sugaya Article and the '874 Patent. Specifically, as summarized in Tellabs' pending motion, Tellabs took the position that "[e]very element of [the asserted claims], other than the optical filter which makes the gain substantially even with respect to said different wavelengths, can be found in the July 1995 Sugaya Article" and that "one of skill in the art would have been motivated to employ the gain-flattening filter from the '874 Patent with the July 1995 Sugaya Article in order to achieve a gain that is flat with respect to wavelength." (Tellabs' JMOL at 21, 30.)

As with the '092 Patent, the court's analysis of Tellabs' argument focuses on whether the July 1995 Sugaya Article disclosed an optical amplifier "having a variable number of channels associated with different wavelengths," including a component that "controls the gain to be approximately constant," as required by the asserted claims of the '681 Patent. At trial, Tellabs primarily relied on three pieces of evidence to demonstrate that the optical amplifier described in the July 1995 Sugaya Article controls the gain to be approximately constant in a changing channel count environment. First, Dr. Buckman identified Figures 1 and 10 from the July 1995 Sugaya Article as "two different figures showing [a] different number of channels." (Trial Tr. at 940:17-18; *see generally* 940:7-942:22; *see also* DX-031 at TLIL_0003234 and TLIL_0003238 (English: TLIL_0003241 and TLIL_0003253).) In this context, Dr. Buckman further noted the authors' statement that the optical amplifier disclosed in the July 1995 Sugaya Article "can deal with input changes" by "optimizing the amplification conditions for the sixteen (16) wave amplification . . . same as the four (4) wave amplification." (DX-031 at TLIL_0003238

15

(English: TLIL_0003253); *see also* Trial Tr. at 942:19-22.)  Second, Tellabs introduced Section

3.1 of the July 1995 Sugaya Article, which refers to the optical amplifier being "used for a WDM

network that includes optical cross connect (OXC) systems."  (DX-031 at TLIL_0003236

(English: TLIL_0003245)).  Dr. Buckman testified that "[o]ne purpose of an optical

cross-connect system is to switch channels in and out of a particular optical fiber link, to change

the number of channels."  (Trial Tr. at 947:16-20.)  Similarly, Mr. Sugaya testified that an

optical cross-connect system is used "for switching the optical path of light," and Mr. Sugaya

agreed with counsel that the use of an optical cross-connect system "can result in adding or

dropping channels."  (Trial Tr. at 741:3-11.)  Finally, Dr. Buckman testified that the number of

channels in the optical amplifier disclosed by the July 1995 Sugaya Article could vary, because

"the lasers which supply these different wavelengths . . . can die at any time and then you've got

a change in the number of channels."  (Trial Tr. at 943:21-944:3.)

     Fujitsu Limited takes the position that a reasonable jury could have concluded from the

evidence at trial that the July 1995 Sugaya Article did not disclose an optical amplifier that

controls the gain to be approximately constant in a changing channel count environment.  (*See*

Fujitsu's Resp. at 29 ("[I]n the face of a varying number of channels, the controller disclosed in

the *July 1995 Sugaya Article* suffers from the same shortcomings as does the '092 Patent."); *see*

*also id.* at 33 ("the consensus among the witnesses [was] that the controller in the *July 1995*

*Sugaya Article* changed the gain rather than kept the gain constant with respect to a varying

number of channels").)  As with the '092 Patent, Mr. Sugaya testified that the optical amplifier

disclosed in the July 1995 Sugaya Article was "directed at a fixed number of channels" (Trial Tr.

at 731:20-21) and Dr. Willner testified that the optical amplifier disclosed in the July 1995

16

Sugaya Article could be described as "[a] fixed-channel count amplifier" (Trial Tr. at 1210:12-14). Dr. Willner further opined that "[w]hen the number of channels changes, [the amplifier disclosed in the July 1995 Sugaya Article] would — erroneously would make a mistake and it would change the gain." (Trial Tr. at 1210:18-20; *see also* Trial Tr. at 1217:1-3 ("These amplifiers in the July 1995 article as well as the '092 patent, if there is a change in the number of channels, it will change the gain erroneously.").) Likewise, in response to a question regarding the optical amplifier disclosed in the July 1995 Sugaya Article, Mr. Sugaya testified that "[w]hen the environment is one of which the number of channels changes, the gain changes." (Trial Tr. at 739:12-13.) Dr. Buckman testified that the optical amplifier disclosed in the July 1995 Sugaya Article did not include circuitry that would keep the gain across the entire optical amplifier constant if there was a change in the channel count. (Trial Tr. at 1168:10-16 ("Q: … there is no circuitry in the Sugaya July 1995 reference which allows the gain across the entire optical amplifier to remain constant if there's a change in channel count, is there? A: … There's not circuitry provided that will keep that particular overall gain constant.").)

In response to Tellabs' reliance on Figures 1 and 10 of the July 1995 Sugaya Article, Fujitsu Limited notes Dr. Buckman's concession that "[t]here was no attempt made in the Sugaya reference July 1995 marked as Exhibit DX 31 to operate this system in an environment where channel counts actually changed while the operational — while the amplifier was operating" and Dr. Buckman's understanding that the authors instead physically "changed filters in order to have one which would accommodate this wider range of wavelengths corresponding to the use of 16 channels." (Trial Tr. at 1128:22-1129:1; 1128:13-16.) In response to Tellabs' reliance on Section 3.1's reference to optical cross connect systems, Fujitsu Limited notes that

17

Mr. Sugaya, Dr. Willner, and Dr. Buckman all testified that optical cross connect systems do not necessarily indicate a change in the overall channel count. (*See* Trial Tr. at 741:3-7 (Sugaya) (an optical cross connect system is "for switching the optical path of light"); Trial Tr. at 1214:7-8 (Willner) ("although an [optical cross connect] might change the number of channels, many times it doesn't"); Trial Tr. at 1169:1-3 (Buckman) ("Q. Isn't it true that cross-connects can be used to switch signals rather than drop or add them? A. They can be used for both.").)

After considering the testimony and evidence presented at trial, a reasonable jury could have concluded that the July 1995 Sugaya Article did not disclose an optical amplifier "having a variable number of channels associated with different wavelengths," including a component that "controls the gain to be approximately constant," as required by the asserted claims of the '681 Patent. Because Tellabs does not argue that this missing claim element is supplied by either the '874 Patent or by the general knowledge of a person of ordinary skill in the art, a reasonable jury could have concluded that Tellabs did not meet its burden of establishing by clear and convincing evidence that the July 1995 Sugaya Article and the '874 Patent in combination rendered the asserted claims of the '681 Patent obvious.

## CONCLUSION

For the reasons set forth above, "Fujitsu's Renewed Motion for Judgment as a Matter of Law that Tellabs Infringes Claims 6, 7, and 8 of U.S. Patent No. 7,228,681, Notwithstanding the Jury Verdict of Non-Infringement; or, Alternatively Motion for a New Trial" (Case No. 09 C 4530, Dkt. No. 962) and "Tellabs, Inc.'s, Tellabs Operations, Inc.'s, and Tellabs North America, Inc.'s Renewed Motion for Judgment as a Matter of Law that U.S. Patent No. 7,227,681 Is Invalid" (Case No. 08 C 3379, Dkt. No. 566) are both denied in their entirety.

18

Tellabs' original "Motion for Judgment as a Matter of Law that U.S. Patent No. 7,227,681 Is Invalid" (Case No. 08 C 3379, Dkt. No. 557) and Tellabs' "Motion for Judgment as a Matter of Law Based on Fujitsu Limited's Failure to Prove Infringement of Claims 6-8" (Case No. 08 C 3379, Dkt. Nos. 547, 552, 555 (renewed)) are denied as moot.

ENTER:

James F. Holderman

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: January 24, 2013

19

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3**
**Eastern Division**

Tellabs Operation, Inc.
                              Plaintiff,

v.                                          Case No.: 1:08−cv−03379
                                            Honorable James F. Holderman

Fujitsu Limited, et al.
                              Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Friday, September 7, 2012:

        MINUTE entry before Honorable James F. Holderman: Jury trial held and concluded. Jury returns its verdict. Judgment is ordered entered pursuant to Federal Rule of Civil Procedure 54(b) in favor of Tellabs on Fujitsu's claim for infringement of the '681 Patent and in favor of Fijitsu on Tellabs' claim for invalidity of the '681 Patent. Jury poll confirmed verdict was unanimous. Enter Judgment. Parties post−trial motions shall be filed by 10/5/12. Responses shall be field by 10/19/12. Replies shall be field by 11/2/12. The final verdict form signed by all the jurors will be scanned (with the jurors' signatures redacted) into the court record as the verdict of the jury. The document referred to as the "original" form on which the jurors made "extraneous marks" is ordered destroyed along with the notes of the jurors as they are not a part of the official record. Notice mailed by judge's staff (ntf, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

US007227681B2

(12) **United States Patent**
Sugaya et al.

(10) Patent No.: **US 7,227,681 B2**
(45) Date of Patent: **\*Jun. 5, 2007**

(54) **CONTROLLER WHICH CONTROLS A VARIABLE OPTICAL ATTENUATOR TO CONTROL THE POWER LEVEL OF A WAVELENGTH-MULTIPLEXED OPTICAL SIGNAL WHEN THE NUMBER OF CHANNELS ARE VARIED**

(75) Inventors: **Yasushi Sugaya**, Kawasaki (JP); **Susumu Kinoshita**, Kawasaki (JP)

(73) Assignee: **Fujitsu Limited**, Kawasaki (JP)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/956,107**

(22) Filed: **Oct. 4, 2004**

(65) **Prior Publication Data**

US 2005/0046927 A1    Mar. 3, 2005

**Related U.S. Application Data**

(60) Division of application No. 10/650,990, filed on Aug. 29, 2003, now Pat. No. 6,865,016, which is a division of application No. 10/057,866, filed on Jan. 29, 2002, now Pat. No. 6,646,791, which is a continuation of application No. 09/811,787, filed on Mar. 20, 2001, now Pat. No. 6,377,395, which is a continuation of application No. 09/359,779, filed on Jul. 26, 1999, now abandoned, which is a continuation of application No. 09/158,571, filed on Sep. 22, 1998, now Pat. No. 5,966,237, which is a division of application No. 08/845,847, filed on Apr. 28, 1997, now Pat. No. 6,025,947.

(30) **Foreign Application Priority Data**

May 2, 1996   (JP)   .................................... 8-111447

(51) Int. Cl.
*H01S 3/00*   (2006.01)
(52) U.S. Cl. ............................. **359/337.1**; 359/337.12; 359/341.41
(58) Field of Classification Search ............. 359/337.1, 359/337.12, 341.41
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,644,145 A    2/1987   Gundner ..................... 359/134

(Continued)

FOREIGN PATENT DOCUMENTS

DE    195 16 439    11/1995

(Continued)

OTHER PUBLICATIONS

Japanese Publication "Er.Doped Fiber Amplifier for WDM Transmission Using Fiber Gain Control," Technical Report of IEICE, 0CS94-66, OPE94, Nov. 1994, (including English language Abstract).

(Continued)

*Primary Examiner*—Deandra M. Hughes
(74) *Attorney, Agent, or Firm*—Staas & Halsey LLP

(57) **ABSTRACT**

An optical amplifier which amplifies a wavelength division multiplexed (WDM) optical signal having a variable number of channels associated with different wavelengths and outputs the amplified WDM optical signal. The optical amplifier includes (a) an optical attenuator which controls a level of the amplified WDM optical signal, and (b) a controller which controls the WDM optical signal to be amplified with an approximately constant gain.

**16 Claims, 29 Drawing Sheets**



## US 7,227,681 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,280,383 | A | | 1/1994 | Federici et al. |
| 5,361,319 | A | | 11/1994 | Antos et al. |
| 5,396,360 | A | | 3/1995 | Majima ...................... 359/133 |
| 5,406,404 | A | | 4/1995 | DiGiovanni et al. ........ 359/161 |
| 5,436,760 | A | | 7/1995 | Nakabayashi ............... 359/341 |
| 5,463,487 | A | | 10/1995 | Epworth ..................... 359/160 |
| 5,506,724 | A | * | 4/1996 | Shimizu et al. ...... 359/341.41 |
| 5,510,926 | A | | 4/1996 | Bayart et al. .............. 359/160 |
| 5,530,584 | A | | 6/1996 | Myslinski et al. ....... 359/337.1 |
| 5,552,919 | A | * | 9/1996 | Majima et al. ............. 398/213 |
| 5,570,438 | A | * | 10/1996 | Fontana et al. ............... 385/24 |
| 5,600,481 | A | * | 2/1997 | Nakabayashi .......... 359/337.13 |
| 5,642,215 | A | | 6/1997 | Suzuki et al. ............... 398/147 |
| 5,664,131 | A | | 9/1997 | Sugiya ....................... 359/341 |
| 5,673,129 | A | * | 9/1997 | Mizrahi ....................... 398/95 |
| 5,675,432 | A | * | 10/1997 | Kosaka ................... 359/337.13 |
| 5,680,246 | A | * | 10/1997 | Takahashi et al. ..... 359/341.43 |
| 5,717,510 | A | * | 2/1998 | Ishikawa et al. ............ 398/199 |
| 5,754,571 | A | * | 5/1998 | Endoh et al. ................. 372/20 |
| 5,764,404 | A | | 6/1998 | Yamane et al. ............ 359/341 |
| 5,805,322 | A | | 9/1998 | Tomofuji ................... 359/341 |
| 5,831,754 | A | | 11/1998 | Nakano ..................... 359/161 |
| 5,861,980 | A | * | 1/1999 | Ono ...................... 359/337.12 |
| 5,900,969 | A | * | 5/1999 | Srivastava et al. ..... 359/341.42 |
| 5,946,117 | A | * | 8/1999 | Meli et al. ................... 398/80 |
| 5,986,237 | A | | 11/1999 | Sterling et al. ............ 359/341 |
| 5,995,274 | A | | 11/1999 | Sugaya et al. ............. 359/337 |
| 6,025,947 | A | | 2/2000 | Sugaya et al. ............. 359/160 |
| 6,055,092 | A | | 4/2000 | Sugaya et al. ............. 359/337 |
| 6,067,187 | A | * | 5/2000 | Onaka et al. ......... 359/337.11 |
| 6,144,485 | A | * | 11/2000 | Sugaya et al. ............. 359/337 |
| 6,157,481 | A | * | 12/2000 | Sugaya et al. ............. 359/337 |
| 6,198,572 | B1 | | 3/2001 | Sugaya et al. ............. 359/337 |
| 6,342,965 | B1 | | 1/2002 | Kinoshita .................. 359/334 |
| 6,377,395 | B2 | | 4/2002 | Sugaya et al. ......... 359/341.41 |
| 6,646,791 | B2 | | 11/2003 | Sugaya et al. ......... 359/341.41 |

### FOREIGN PATENT DOCUMENTS

| DE | 195 16 439 A1 | 11/1995 |
|---|---|---|
| DE | 19516439 | 11/1995 |
| EP | 0 637 148 A1 | 2/1995 |
| EP | 0 677 902 A1 | 10/1995 |
| EP | 0 685 947 A1 | 12/1995 |
| EP | 0695050 | 1/1996 |
| EP | 0 812 078 A2 | 12/1997 |
| GB | 2280561 | 2/1995 |
| GB | 2 294 170 A | 4/1996 |
| GB | 2294170 | 4/1996 |
| JP | 3-206427 | 9/1991 |
| JP | 5-241209 | 9/1993 |
| JP | 7212315 | 8/1995 |
| JP | 09219696 A * | 8/1997 |

### OTHER PUBLICATIONS

Nakabayashi, et al., Tech, Report of IEICE, OCS 94-66, OPE 94-89 (Nov. 1994) pp. 31-36 and 1-15.

Sugaya et al., OAA '95 Paper FC3, Jun. 16, 1995, 5 pages.

Chen, et al. "Field Experiment of 10Gbit/s, 360km Transmission Through Embedded Standard (non-DSF) Fibre Cables", Electronics Letters, Jul. 7, 1994, vol. 30, No. 14, pp. 1159-1160.

Zyskind et al., "Fast Power Transients in Optically Amplified Multiwavelength Optical Networks", OFC '96, Optical Fiber Communication, Technical Digest Series, Postconference Edition (IEEE Cat. No. CH35901), vol. 2, Feb. 25, 1996, pp. 451-454, XP-002109064.

Y. Sugaya, et al., "Novel Configuration for Low-Noise and Wide-Dynamic-Range ER-Doped Fiber Amplifier for WDM Systems", OAA '95, Paper FC32, Jun. 16, 1995.

European Patent Office Search Report dated Feb. 24, 2006 for corresponding European Patent Application No. 98 123 442.0-2415.

Chinese Office Action dated Nov. 3, 2006, for related Chinese Application No. 02123246.6.

* cited by examiner



*FIG. 1*
PRIOR ART



*FIG. 2*
PRIOR ART







*FIG. 5*

# FIG. 6



Case: 13-1226 Case: 13-1226 CASE PARTICIPANTS ONLY Document: 23 Document: 102 Page: 108 Filed: 06/10/2013 Filed: 06/10/2013

## FIG. 7





*FIG. 8*



FIG. 9

Case: 13-1226 Case: PARTICIPANTS ONLY Document: 23 Page: 111 Filed: 06/10/2013



Case: 13-1226    Case: PARTICIPANTS ONLY    Document: 23    Page: 112    Filed: 06/10/2013    Page: 06/10/2013



FIG. II



*FIG. 12*

Case: 13-1226 Case: PARTICIPANTS ONLY Document: 23 Page: 114 Filed: 06/10/2013



*FIG. 13*



*FIG. 14*



FIG. 15



FIG. 16



*FIG. 17*

## FIG. 18(A)



GAIN OF
EDF $52_2$

WAVELENGTH

## FIG. 18(B)



TRANSMISSIVITY
OF
FILTER A2

WAVELENGTH

## FIG. 18(C)



OVERALL
GAIN OF
EDF $52_2$
AND FILTER
A2

WAVELENGTH





*FIG. 20*



FIG. 21



*FIG. 22*



FIG. 23



*FIG. 24*



*FIG. 25*



*FIG. 26*

Case: 13-1226 Case: PARTICIPANTS ONLY Document: 23 Page: 128 Filed: 06/10/2013 Filed: 06/10/2013



*FIG. 27*

## FIG. 28





*FIG. 29*

US 7,227,681 B2

**1**

# CONTROLLER WHICH CONTROLS A VARIABLE OPTICAL ATTENUATOR TO CONTROL THE POWER LEVEL OF A WAVELENGTH-MULTIPLEXED OPTICAL SIGNAL WHEN THE NUMBER OF CHANNELS ARE VARIED

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a divisional of application Ser. No. 10/650,990, filed Aug. 29, 2003, now U.S. Pat. No. 6,865, 016, which is a divisional application of application Ser. No. 10/057,866, filed Jan. 29, 2002, now U.S. Pat. No. 6,646, 791, which is a continuation of application Ser. No. 09/811, 787, filed Mar. 20, 2001, now U.S. Pat. No. 6,377,395, which is a continuation of application Ser. No. 09/359,779, filed Jul. 26, 1999, now abandoned, which is a continuation of application Ser. No. 09/158,571, filed Sep. 22, 1998, now U.S. Pat. No. 5,966,237, which is a divisional of application of Ser. No. 08/845,847, filed Apr. 28, 1997, now U.S. Pat. No. 6,025,947.

This application is based on, and claims priority to, Japanese patent application 08-111447, filed May 2, 1996, in Japan, and which is incorporated herein by reference.

This application is related to U.S. patent application Ser. No. 08/655,027, filed May 28, 1996, and which is incorporated herein by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a fiber optic communication system which uses wavelength division multiplexing to transmit a wavelength-multiplexed optical signal. More specifically, the present invention relates to a controller which controls an optical attenuator or an optical amplifier to change the power level of the wavelength-multiplexed optical signal when the number of channels are varied.

2. Description of the Related Art

Wavelength division multiplexing is used in fiber optic communication systems to transfer a relatively large amount of data at a high speed.

FIG. **1** is a diagram illustrating a conventional fiber optic communication system which uses wavelength division multiplexing to transmit, for example, four channels through a single optical fiber. Referring now to FIG. **1**, transmitting units **20-1**, **20-2**, **20-3** and **20-4** transmit individual carriers having wavelengths λ1–λ4, respectively. Each carrier is modulated with a controller, and represents an individual channel. The different carriers are multiplexed together by an optical multiplexer **22** into a wavelength-multiplexed optical signal. The wavelength-multiplexed optical signal is transmitted through an optical fiber **24** to an optical demultiplexer **26**. Optical demultiplexer **26** branches the wavelength-multiplexed optical signal into four separate optical signals having the wavelengths λ1–λ4, respectively. The four separate branched optical signals are then detected by receiving units **28-1**, **28-2**, **28-3** and **28-4**, respectively.

While the above optical fiber communication system multiplexes four carriers together, it is common practice to multiplex more than four carriers. More specifically, many different carriers may be multiplexed together. In this manner, a relatively large amount of data can be transmitted through an optical fiber.

An optical amplifier (not illustrated) or an optical repeater (not illustrated) is typically inserted between optical multi-

**2**

plexer **22** and optical demultiplexer **26**, to amplify the wavelength-multiplexed optical signal travelling through optical fiber **24**. Such an optical amplifier is typically a rare-earth doped optical fiber amplifier which directly amplifies the wavelength-multiplexed optical signal. That is, a rare-earth doped optical fiber amplifier amplifies the wavelength-multiplexed optical signal without converting the wavelength-multiplexed optical signal into an electrical signal.

Unfortunately, the use of a rare-earth doped optical fiber amplifier causes several problems when the number of channels in the wavelength-multiplexed optical signal is varied. More specifically, during the variation (that is, before the variation in the number of channels is complete), the optical power of each channel can undesireably be varied, thereby causing non-linear degradation or S/N degradation of the wavelength-multiplexed optical signal.

## SUMMARY OF THE INVENTION

Accordingly, it is an object of the present invention to provide an optical amplifying apparatus which reduces non-linear degradation and S/N degradation of a wavelength-multiplexed optical signal when the number of channels are varied.

Additional objects and advantages of the invention will be set forth in part in the description which follows, and, in part, will be obvious from the description, or may be learned by practice of the invention.

The foregoing objects of the present invention are achieved by providing an apparatus which includes an optical amplifier and a controller. The optical amplifier amplifies a light signal having a variable number of channels. The controller controls a power level of the amplified light signal in response to variations in the number of channels in the light signal.

More specifically, objects of the present invention are achieved by providing a controller which (a) prior to, and subsequent to, varying the number of channels in the light signal, passes the amplified light signal with a varying light transmissivity so that a power level of the amplified light signal is maintained at an approximately constant level in accordance with the number of channels in the light signal, and, (b) while the number of channels in the light signal is being varied, passes the amplified light signal with a constant light transmissivity.

Objects of the present invention are also achieved by providing an apparatus which includes an optical amplifier, a controller, a demultiplexer and an automatic level control unit. The optical amplifier amplifies a light signal having a variable number of channels. The controller controls the amplified light signal in response to variations in the-number of channels in the light signal. The demultiplexer demultiplexes the controlled, amplified light signal into individual signals. The automatic level control unit controls the power level of a respective individual signal so that the power level of the individual signal is maintained to be approximately constant.

Objects of the present invention are also achieved by providing an apparatus which includes an automatic level control unit and an optical fiber amplifier. The automatic level control unit maintains a power level of a light signal to be approximately constant and produces a corresponding output signal. The optical fiber amplifier amplifies the output signal of the automatic level control unit with a constant gain.

US 7,227,681 B2

3

Objects of the present invention are further achieved by providing an optical amplifier and a controller. The optical amplifier amplifies a light signal having a variable number of channels. Prior to, and subsequent to, varying the number of channels in the light signal, the controller maintains a power level of the amplified light signal at an approximately constant level in accordance with the number of channels in the light signal. While the number of channels in the light signal is being varied, the controller amplifies the amplified light signal with an approximately constant gain.

Moveover, objects of the present invention are achieved by providing an apparatus which includes an optical amplifier, an optical attenuator and a controller. The optical amplifier amplifies a light signal having a variable number of channels. The optical attenuator passes the amplified light signal and has a variable light transmissivity. Prior to varying the number of channels in the light signal, the controller varies the light transmissivity of the optical attenuator so that a power level of the amplified light signal is maintained at an approximately constant level that depends on the number of channels in the light signal prior to the varying the number of channels. While the number of channels in the light signal is being varied, the controller maintains the light transmissivity of the optical attenuator to be constant. Subsequent to varying the number of channels in the light signal, the controller varies the light transmissivity of the optical attenuator so that a power level of the amplified light signal is maintained at an approximately constant level that depends on the number of channels in the light signal subsequent to the varying the number of channels.

Objects of the present invention are also achieved by providing a method for controlling a light signal having a variable number of channels and amplified by an optical amplifier. The method includes the steps of: (a) prior to, and subsequent to, varying the number of channels in the light signal, passing the amplified light signal with a varying light transmissivity so that a power level of the amplified light signal is maintained at an approximately constant level in accordance with the number of channels in the light signal, and, (b) while the number of channels in the light signal is being varied, passing the amplified light signal with a constant light transmissivity.

Objects of the present invention are achieved by providing a method for controlling a light signal having a variable number of channels and amplified by an optical amplifier, wherein the method includes the steps of: (a) prior to, and subsequent to, varying the number of channels in the light signal, maintaining a power level of the amplified light signal at an approximately constant level in accordance with the number of channels in the light signal, and, (b) while the number of channels in the light signal is being varied, amplifying the amplified light signal with an approximately constant gain.

BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects and advantages of the invention will become apparent and more readily appreciated from the following description of the preferred embodiments, taken in conjunction with the accompanying drawings of which:

FIG. 1 (prior art) is a diagram illustrating a conventional fiber optic communication system.

FIG. 2 (prior art) is a diagram illustrating an optical amplifying apparatus for a fiber optic communication system which uses wavelength division multiplexing.

4

FIG. 3 is a diagram illustrating an optical amplifying apparatus, according to an embodiment of the present invention.

FIGS. 4(A) and 4(B) are graphs illustrating the operation of the optical amplifying apparatus in FIG. 3, wherein the number of channels, N, in an optical signal is changed, according to an embodiment of the present invention.

FIG. 5 is a diagram illustrating an automatic gain control circuit, according to an embodiment of the present invention.

FIG. 6 is a diagram illustrating automatic level control circuit, according to an embodiment of the present invention.

FIG. 7 is a diagram illustrating a switching circuit of the automatic level control circuit in FIG. 6, according to an embodiment of the present invention.

FIGS. 8 and 9 are diagrams illustrating an automatic level control circuit, according to additional embodiments of the present invention.

FIG. 10 is a diagram illustrating an optical amplifying apparatus, according to an additional embodiment of the present invention.

FIG. 11 is a diagram illustrating an optical amplifying apparatus, according to a further embodiment of the present invention.

FIG. 12 is a diagram illustrating an optical amplifying apparatus, according to an embodiment of the present invention.

FIG. 13 is a diagram illustrating an optical amplifying apparatus, according to an additional embodiment of the present invention.

FIG. 14 is a diagram illustrating an optical amplifying apparatus, according to an additional embodiment of the present invention.

FIG. 15 is a diagram illustrating an optical amplifying apparatus, according to a further embodiment of the present invention.

FIG. 16 is a diagram illustrating an optical amplifying apparatus, according to a still further embodiment of the present invention.

FIG. 17 is a diagram illustrating modification to the optical amplifying apparatus illustrated in FIG. 16, according to an embodiment of the present invention.

FIG. 18(A) is a graph illustrating gain versus wavelength characteristics of a rare-earth-doped optical fiber (EDF) in an optical amplifying apparatus, according to an embodiment of the present invention.

FIG. 18(B) is a graph illustrating the transmissivity of an optical filter in an optical amplifying apparatus, according to an embodiment of the present invention.

FIG. 18(C) is a graph illustrating overall gain of the rare-earth-doped optical fiber (EDF) in FIG. 18(A) and the optical filter in FIG. 18(B), according to an embodiment of the present invention.

FIG. 19 is a diagram illustrating an optical amplifying apparatus, according to an embodiment of the present invention.

FIG. 20 is a diagram illustrating an optical amplifying apparatus, according to an additional embodiment of the present invention.

FIG. 21 is a diagram illustrating an optical amplifying apparatus, according to a further embodiment of the present invention.

FIG. 22 is a diagram illustrating an optical amplifying apparatus, according to a still further embodiment of the present invention.

US 7,227,681 B2

5

FIG. 23 is a diagram illustrating an optical amplifying apparatus, according to an embodiment of the present invention.

FIG. 24 is a more detailed diagram of a portion of the optical amplifying apparatus in FIG. 23, according to an embodiment of the present invention.

FIG. 25 is a diagram illustrating a fiber optic communication system employing an optical amplifying apparatus according to an embodiment of the present invention.

FIG. 26 is a more detailed diagram illustrating the optical amplifying apparatus of FIG. 25, according to an embodiment of the present invention.

FIG. 27 is a diagram illustrating a transmission line employing a plurality of optical amplifying apparatuses, according to an embodiment of the present invention.

FIG. 28 is a timing diagram illustrating the operation of an optical amplifying apparatus, according to an embodiment of the present invention.

FIG. 29 is a diagram illustrating a portion of an optical communication system, according to an embodiment of the present invention.

EMBODIMENTS OF THE INVENTION

Reference will now be made in detail to the present preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings, where like reference numerals refer to like elements throughout.

FIG. 2 is a diagram illustrating an optical amplifying apparatus for a fiber optic communication system which uses wavelength division multiplexing, and is similar to that disclosed in related to U.S. patent application Ser. No. 08/655,027, which is incorporated herein by reference

Referring now to FIG. 2, the optical amplifying apparatus includes a first part 1000 (sometimes referred to herein as a "rare-earth-doped optical fiber amplifier part") and a second part 2000 (sometimes referred to herein as an "electrically-controlled optical device part").

First part 1000 includes a rare-earth-doped optical fiber (EDF) 34, optical branching couplers $36_1$ and $36_2$, optical isolators $38_1$ and $38_2$, photodiodes $40_1$ and $40_2$, an optical wavelength multiplexing coupler 42, a pump laser diode (LD) 44 and an automatic optical gain control circuit (AGC) 46.

Second part 2000 includes optical branching coupler $36_3$, an electrically-controlled variable optical attenuator (ATT) 48, a photodiode (PD) $40_3$ and an automatic level control circuit (ALC) 50. Optical attenuator 48 is, for example, constructed of a magnetooptical element. However, many different types of variable optical attenuators can be used.

A wavelength-multiplexed optical signal is fed to rare-earth-doped optical fiber 34 via optical branching coupler $36_1$, optical isolator 38 and optical wavelength multiplexing coupler 42. A pump light beam is supplied by pump laser diode 44 to rare-earth-doped optical fiber 34 via optical wavelength multiplexing coupler 42. The wavelength-multiplexed optical signal is amplified by rare-earth-doped optical fiber 34 and input to optical attenuator 48 via optical isolator $38_2$ and optical branching coupler $36_2$.

A portion of the wavelength-multiplexed optical signal branched by optical branching coupler $36_1$ is converted into an electrical signal by photodiode $40_1$ and input to automatic optical gain control circuit 46. A portion of the amplified wavelength-multiplexed optical signal branched by optical branching coupler $36_2$ is converted into an electrical signal by photodiode $40_2$ and input to automatic optical gain

6

control circuit 46. Pump laser diode 44 is controlled so as to maintain a ratio between a level of the input wavelength-multiplexed optical signal and a level of the amplified wavelength-multiplexed optical signal at a predetermined level.

More specifically, optical gain control circuit 46 controls pump laser diode 44 so as to maintain, at a constant level, the ratio between the level of the input wavelength-multiplexed optical signal as converted into an electrical signal by the photodiode $40_1$ and the level of the amplified wavelength-multiplexed optical signal as converted into an electrical signal by the photodiode $40_2$. In this manner, first part 1000 conserves the wavelength dependence by controlling the optical gain at a constant level.

A portion of an output wavelength-multiplexed optical signal branched by optical branching coupler $36_3$ is converted into an electrical signal by photodiode $40_3$ and input to automatic level control circuit 50. Optical attenuator 48 is controlled so as to maintain the wavelength-multiplexed optical signal at a predetermined level.

More specifically, automatic level control circuit 50 controls optical attenuator 48 using the electrical signal derived by photodiode $40_3$ from the wavelength-multiplexed optical signal, so as to maintain the output level of the wavelength-multiplexed optical signal at a constant level.

Unfortunately, when an optical amplifying apparatus, as illustrated in FIG. 2, is used in a fiber optic communication system which uses wavelength division multiplexing, a variation in the number of channels used in the wavelength-multiplexed optical signal can cause significant problems.

For example, a predetermined output optical power of an amplifier is generally required for each wavelength (channel) so as to ensure a desired S/N ratio in a receiver. Assuming there are a total of N channels, the total optical output Pc of a rare-earth-doped optical fiber amplifier for amplifying a wavelength-multiplexed optical signal is controlled to be N×P. In the presence of a variation of +α or −α in the number of channels N, switching control is effected so that the total optical power is (N±α)P. Because the optical power for individual wavelengths (channels) varies due to the switching control, non-linear degradation or signal-to-noise (S/N) degradation may result.

Further, in FIG. 2, the optical output of first part 1000 is to be maintained at a constant level by second part 2000. Therefore, when the optical output of first part 1000 exceeds a predetermined level, second part 2000 maintains the optical output at a constant level. As a result, the use of optical attenuator 48 will require an extra measure of amplification by first part 32, and the output power of pump laser diode 44 for maintaining the optical gain at a constant level should be controlled to be in an exponential relation to a variation in the level of the input wavelength-multiplexed optical signal. Therefore, it is necessary to provide a relatively high-capacity pump laser diode 44.

FIG. 3 is a diagram illustrating an optical amplifying apparatus, according to an embodiment of the present invention. The optical amplifying apparatus includes a first part 1000 and a second part 2000. First part 1000 includes a rare-earth-doped optical fiber (EDF) $52_1$, optical branching couplers $54_1$ and $54_2$, optical isolators $55_1$ and $55_2$, an optical wavelength multiplexing coupler $56_1$, photodiodes (PD) $58_1$ and $58_2$, a pump laser diode (LD) $59_1$, and an automatic gain control circuit (AGC) $60_1$. First part 1000 amplifies a wavelength-multiplexed optical signal while conserving wavelength dependance.

As an example, a wavelength-multiplexed optical signal is typically in the 1.5 μm band. An erbium-doped optical

US 7,227,681 B2

7

fiber is known to amplify optical signals in this band, and is therefore used as rare-earth-doped optical fiber (EDF) $52_1$. Moreover, to appropriately amplify a wavelength-multiplexed optical signal in the 1.5 μm band travelling through an erbium-doped optical fiber, it is known to use pump light of a 0.98 μm or 1.48 μm pump band. Therefore, pump laser diode (LD) $59_1$ provides pump light in the 0.98 μm or 1.48 μm pump band.

Moreover, FIG. 3 shows a forward pumping construction in which a pump light beam emitted by pump laser diode $59_1$ travels through rare-earth-doped optical fiber $52_1$ in the same direction as the wavelength-multiplexed optical signal. However, a backward pumping construction could also be used, where a laser diode provides a pump light beam which travels through rare-earth-doped optical fiber $52_1$ in the opposite direction as the wavelength-multiplexed optical signal. Further, a bi-directional pumping construction could be used, where two laser diodes provide pump light which travels through rare-earth-doped optical fiber $52_1$ in both directions through rare-earth-doped optical fiber $52_1$. Thus, the present invention is not intended to be limited to any specific type of directional pumping.

Second part **2000** includes an electrically-controlled variable optical attenuator (ATT) **64**, an automatic level control circuit (ALC) **66**, optical branching coupler $54_3$ and a photodiode (PD) $58_3$. Second part **2000** controls the total optical output of a wavelength-multiplexed optical signal to be at a constant level, without conserving wavelength dependence. More specifically, -automatic level control circuit **66** varies the attenuation, or light transmissivity, of optical attenuator **64** so that the power of the wavelength-multiplexed optical signal, as output from first part **1000**, is maintained at a constant power level corresponding to the number of channels in the wavelength-multiplexed optical signal.

Moreover, when the number of channels in the wavelength-multiplexed optical signal is being varied, a monitor signal processing circuit **70** causes the attenuation, or light transmissivity, of optical attenuator **64** to be maintained constant. Thus, monitor signal processing circuit **70** temporarily "freezes" the operation of optical attenuator **64**. After the number of channels has been changed, monitor signal processing circuit **70** allows the attenuation, or light transmissivity, of optical attenuator **64** to be varied so that the power of the wavelength-multiplexed optical signal is maintained at a constant level in accordance with the new number of channels.

More specifically, the wavelength-multiplexed optical signal input to the optical amplifying apparatus is branched by an optical branching coupler $68_1$. The branched portion is provided to a photodiode (PD) $58_4$. Photodiode (PD) $58_4$ converts the branched portion into an electrical signal and provides the electrical signal to monitor signal processing circuit **70**.

A control signal, which warns of a variation in the number of channels in the wavelength-multiplexed optical transmission system, is superimposed on the wavelength-multiplexed optical signal preferably as a low-speed signal through an amplitude modulation process. However, other methods can be used to superimpose the control signal. Monitor signal processing circuit **70** extracts and identifies the control signal. Monitor signal processing circuit **70** then controls optical attenuator **64** or automatic level control circuit **66** in accordance with the extracted control signal. If amplitude modulation is used, it is relatively easy to extract the control signal by demodulating the electrical signal obtained by photodiode $58_4$.

8

Alternatively, the control signal may be transmitted to monitor signal processing circuit **70** on a dedicated control channel (wavelength). If a dedicated control channel is used, an optical branching filter (not illustrated) should extract the control signal out of the wavelength-multiplexed optical signal (as branched by optical branching coupler $68_1$). For example, by feeding the optical signal extracted by the optical branching filter to photodiode $58_4$ so as to be converted into an electrical signal, it is possible to extract the control signal.

Therefore, a portion of the wavelength-multiplexed optical signal branched by optical branching coupler $68_1$ is converted into an electrical signal by photodiode $58_4$ and fed to monitor signal processing circuit **70**. Monitor signal processing circuit **70** "freezes" an operation of optical attenuator **64**, when a control signal warning of a variation in the number of channels is extracted and identified.

In order to ensure that the power level of the attenuated wavelength-multiplexed optical signal matches the number of channels, monitor signal processing circuit **70** causes a set voltage (reference voltage) to be selected. The power level can then be controlled to be at a constant level corresponding to the set voltage.

Generally, there are two approaches for monitor signal processing circuit **70** to control optical attenuator **64**. In one approach, optical attenuator **64** is directly controlled by monitor signal processing circuit **70**, as illustrated by control signal **69** in FIG. **3**. In an alternative approach, optical attenuator **64** is indirectly controlled by monitor signal processing circuit **70**, as illustrated by control line **71** in FIG. **3**.

The number of channels may actually be increased or decreased after a warning for a change in the number of channels. In this instance, a control signal, which indicates the completion of the change in the number of channels, is superimposed on the wavelength-multiplexed optical signal. Monitor signal processing circuit **70** then extracts the control signal. Alternatively, the control signal may be transmitted to monitor signal processing circuit **70** on a dedicated control channel (wavelength). Upon extracting and identifying the control signal, monitor signal processing circuit **70** allows optical attenuator **64** to resume its control for maintaining the power level of the wavelength-multiplexed optical signal at a constant level.

Alternatively, instead of providing monitor signal processing circuit **70** with a control signal indicating the completion of the change in the number of channels, such completion can be assumed after a predetermined period of time elapses. More specifically, the number of channels may actually be increased or decreased after lapse of a predetermined period of time since the warning for a change in the number of channels is given. In this instance, after the control signal for giving warning of a variation in the number of channels is extracted and identified by monitor signal processing signal **70**, a timer (not illustrated) is activated. When a predetermined period of time has passed, optical attenuator **64** is driven again to maintain the power level of the wavelength-multiplexed optical signal at a constant level.

Whether a control signal or a predetermined period of time is used to indicate the completion of a variation in the number of channels, the set voltage (reference voltage) for controlling the power level is switched from one level to another in accordance with information relating to how many channels are added or removed. This information is preferably included in the control signal for warning of a variation in the number of channels. Therefore, by resuming

Case: 13-1226 Case: 13-1226 Document: 23 Page: 135 Filed: 06/10/2013 Filed: 06/10/2013

9

the control for maintaining the total optical output power at a constant level, the optical output is maintained at a constant level that matches the number of channels.

Therefore, in response to a change in the number of channels, optical attenuator **64** prevents a radical variation in the optical output power, by having its attenuation front at a constant level. At this time, second part **2000** no longer operates to maintain the power of the wavelength-multi-plexed optical signal at a constant level. After the number of channels is changed, optical attenuator **64** is again controlled to maintain the power of the wavelength-multiplexed optical signal at a constant level. Optical attenuator **64** may gradually be driven so that a total output power corresponding to the number of channels is maintained. With this arrangement, it is possible to moderate a variation in the optical output and avoid non-linear degradation and S/N ratio degradation.

FIGS. **4**(A) and **4**(B) are graphs illustrating the operation of the optical amplifying apparatus in FIG.**3**, wherein the number of channels, N, in an optical signal is changed from, for example, four channels to eight channels: Referring now to FIGS. **4**(A) and **4**(B), optical attenuator **64** has a variable light transmissivity, or attenuation, which is controlled by automatic level control circuit **66** on monitor signal processing circuit **70**.

In FIGS. **4**(A) and **4**(B), a warning of a change in the number of channels is received at time t**1**, and the number of channels are increased at time t**2**.

Before a warning of a change in the number of channels is received (that is, before time t**1**), automatic level control circuit **66** varies the light transmissivity of electrically-controlled variable optical attenuator **64** to provide a substantially constant optical signal power at the output of optical attenuator **64**. Therefore, before time t**1**, second part **2000** performs automatic-level control (ALC).

When a warning of a change in the number of channels is received (that is, at time t**1**), automatic level control circuit **66** maintains the light transmissivity of electrically-controlled variable optical attenuator **64** to be substantially constant. In this case, the output of optical attenuator **64** can be seen has having a constant gain which is provided, for example, by first part **1000** or by a later stage (not illustrated) which further amplifies the signal. Therefore, after time t**1**, automatic gain control (AGC), not automatic level control (ALC), is performed.

At time t**3**, subsequent to a change in the number of channels, automatic level control circuit **66** varies the light transmissivity of electrically-controlled variable optical attenuator **64** to provide a substantially constant optical signal power at the output of optical attenuator **64**. More specifically, after time t**3**, second part **2000** again performs automatic level control (ALC).

As can be seen from FIGS. **4**(A) and **4**(B), optical attenuator **64** is controlled to provide ALC. However, when the number of channels is being changed, ALC is halted. Instead, when the number of channels is being changed, optical attenuator **64** is controlled to provide a constant light transmissivity, or attenuation. The operation of optical attenuator **64** can be described as being "frozen" when the number of channels is being changed between times t**1** and t**3** in FIGS. **4**(A) and **4**(B).

As described above, between times t**1** and t**3**, the output of optical attenuator **64** has a constant gain which is provided, for example, by first part **1000** or by a later stage (not illustrated) which further amplifies the signal. Alternatively, as disclosed in additional embodiments of the present invention described in more detail below, second part **2000** can be

10

modified so that it provides a constant gain (instead of providing automatic level control) while the number of channels is being changed. In this case, second part **2000** could include a gain controlled amplifier to provide a constant gain for AGC between times t**1** and t**3**.

Therefore, as illustrated in FIGS. **4**(A) and **4**(B), an optical amplifying apparatus includes an optical amplifier (such as first part **1000**) which amplifies a light signal having a variable number of channels. Prior to, and subsequent to, varying the number of channels in the light signal, a controller (such as second part **2000**) passes the amplified light signal with a varying light transmissivity so that a power level of the amplified light signal is maintained at an approximately constant level in accordance with the number of channels in the light signal. Further, while the number of channels in the light signal is being varied, the controller passes the amplified light signal with a constant light transmissivity.

FIG. **5** is a diagram illustrating automatic gain control circuit $60_1$, for controlling an optical gain to be at a constant level. Referring now to FIG. **5**, automatic gain control circuit $60_1$ includes a divider **72**, an operational amplifier **74**, a transistor **76** and resistors R1–R6. $V_{cc}$ is a power supply voltage, $V_{ref}$ is a reference voltage, and G is the earth or ground.

As illustrated in FIG. **5**, photodiode (PD) $58_1$ converts a portion of the wavelength-multiplexed optical signal into an electrical signal which is provided to divider **72**. Photodiode (PD) $58_2$ converts a portion of the amplified wavelength-multiplexed optical signal into an electrical signal which is provided to divider **72**. In this manner, divider **72** obtains a ratio between the input and the output of rare-earth-doped optical fiber (EDF) $52_1$. The pump light beam emitted by pump laser diode $59_1$ can then be controlled to produce a constant ratio, thereby providing a constant gain. The configuration of automatic gain control circuit $60_1$ in FIG. **5** is just one example of many possible configurations for an automatic gain control circuit.

FIG. **6** is a diagram illustrating automatic level control circuit **66**, for controlling an optical output at a constant level. Referring now to FIG. **6**, automatic level control circuit **66** includes resistors R7–R9, an operational amplifier **78**, a transistor **80**, a switching circuit (SWC) **82** and a reference voltage circuit **84**. $V_{cc}$ is the power supply voltage, $V_{ref}$ is a reference voltage, G is the earth or ground, and cs**1** and cs**2** are control signals provided by monitor signal processing circuit **70**. A control element **86** is a control element of optical attenuator **64** for controlling the transmissivity of optical attenuator **64**.

For example, if optical attenuator **64** is operated by a magnetooptical effect, control element **86** may be a coil for applying a magnetic field. Moreover, for example, if optical attenuator is operated by an opto-electrical effect, the control element **86** may be an electrode, where the voltage applied to the electrode is controlled. If a semiconductor optical amplifier is used instead of optical attenuator **64**, a bias voltage for controlling the gain of the semiconductor optical amplifier can be controlled.

A portion of the optical signal output from optical attenuator **64** (see FIG. **3**) is branched by optical branching coupler $54_3$ and converted into an electrical signal by photodiode (PD) $58_3$. Then, in FIG. **6**, operational amplifier **78** compares the electrical signal with the reference voltage (set voltage) $V_{ref}$ supplied by reference voltage circuit **84** in accordance with control signal CS**1**. A difference obtained as a result of the comparison is used to drive transistor **80**. By controlling a current supplied to control element **86**, the attenuation

US 7,227,681 B2

provided by optical attenuator **64** is controlled so that the optical output is maintained at a constant level.

FIG. **7** is a diagram illustrating switching circuit **82**. Referring now to FIG. **7**, switching circuit **82** includes capacitors C1 and C2 which are individually selected with a switch SW that is controlled by the control signal CS2. Therefore, switching circuit **82** controls the frequency characteristic of automatic level control circuit **66**. Moreover, switching circuit **82** controls optical attenuator **64** by controlling transistor **80** by following the level of the output wavelength-multiplexed optical signal with a predetermined frequency characteristic. The control signal cs2 from monitor signal processing circuit **70** changes the frequency characteristic by switching between capacitors C1 and C2 of switching circuit **82**. The control signal cs1 switches between different levels of the reference voltages in accordance with the number of channels.

More specifically, switching circuit **82**, coupled with operational amplifier **78** (see FIG. **6**) and resistors R7 (see FIG. **6**) and R9 (see FIG. **6**), forms a primary low-pass filter. The cut-off frequency, $f_c$, of this primary low-pass filter is:

$$f_c=1/(2\pi R9 \cdot C_{SWC}9),$$

where $C_{SWC}$ is the selected capacitor $C_1$ or $C_2$. Therefore, by increasing the value of the capacitance $C_{SWC}$, the control circuitry shown in FIG. **6** is operated at a lower frequency. That is, the response thereof is slowed down.

Therefore, depending on the capacitance of the selected capacitor C1 or C2 of switching circuit **82**, the filter cut-off frequency in the high-frequency zone can be changed.

As an example, a preferably arrangement may be that the cut-off frequency, which is on the order of 10–100 kHz in the normal ALC operation, be switched to 0.01 Hz when optical attenuator **64** is controlled to provide a constant attenuation (for example, to thereby provide a constant gain when the channels are being switched). Ideally, the control of switching circuit **82** occurs gradually, but a gradual control requires that switching circuit **82** be constructed of a number of capacitors, instead of simply two capacitors.

Referring to FIG. **6**, the cut-off frequency is high before a warning of a change in channels is received. When a signal warning of a variation in the number of channels is received, switching circuit **82** is controlled so that the cut-off frequency is lowered. Accordingly, the attenuation provided by optical attenuator **64** is fixed at an average level. After the change in channels is completed, switching circuit **82** is controlled so that the cut-off frequency is switched again to be high.

For example, when monitor signal-processing circuit **70** extracts and identifies a control signal which warns of a variation in the number of channels, control signal cs2 is supplied to switching circuit **82** so that the frequency characteristic of automatic level control circuit **66** is switched to a low frequency zone. As a result, the following performance for following a variation in the signal detected by photodiode (PD) **58₃** is lowered. That is, the constant-level control of the optical output is temporarily frozen (for example, the light transmissivity of optical attenuator **64** is maintained to be constant). Further, control signal cs1 corresponds to the number of channels to be included in the optical signal, and monitor signal processing circuit **70** supplies the control signal cs1 to reference voltage circuit **84**. Reference voltage circuit **84** then supplies a reference voltage $V_{ref}$ corresponding to the number of channels. Therefore, the total optical output power assumes a level matching the number of channels after the variation in the

number of channels. For example, the reference voltage $V_{ref}$ is changed such that, when a total of $\alpha$ channels are added to the total of N original channels, the total optical output becomes (N+$\alpha$)×P.

Referring again to FIGS. **6** and **7**, the value of the capacitance $C_{SWC}$ may be large enough to freeze the operation of optical attenuator **64**. Generally, this purpose may be achieved if, for example, the cut-off frequency $f_c$ is dropped from 10 kHz to 0.01 Hz, thereby requiring a drop in the cut-off frequency $f_c$ by the factor of 10,000 to 100,000. Such a large drop can be difficult to achieve.

Normally, the attenuation provided by optical attenuator **64** is varying from moment to moment to provide an ALC function and to compensate for a polarization variation. Therefore, abruptly fixing the attenuation of optical attenuator **64** at a certain level (such as when the number of channels are being changed) may cause problems. Instead, the attenuation is preferably maintained at an average level.

More specifically, FIGS. **8** and **9** are diagrams illustrating automatic level control circuit **66**, according to additional embodiments of the present invention. Referring now to FIG. **8**, a filter **90** for cutting off high frequencies ($f_c$:~10 KHz) and constructed of a capacitor and a resistor is provided between a switch **92** and transistor **80** so that the response of the automatic level control becomes adequate. For example, the time constant, typically on the order of sub-milliseconds, may be changed to the time constant on the order of 10–100 milliseconds.

When the cut-off frequency $f_c$ is switched to the high-frequency zone, the filter response becomes quick so that a comparatively high-speed variation, such as a polarization variation, can be cancelled and the output of optical attenuator **64** is maintained constant.

More specifically, in FIG. **8**, a latch circuit **94** which has a low-pass filter ($f_c$:~0.01 Hz) stores a voltage corresponding to an average level of the current in control element **86**. During an ALC operation, switching of the control loop occurs so that the control loop for controlling the drive current at a constant level is initiated. That is, when the switching of the control loop occurs, the voltage corresponding to the average level of the current is latched in latch circuit **94** so as to serve as a reference voltage. The term "average level" is used because the bias current has a time-dependent variation in order to maintain the level of the beam input to photodiode (PD) **58₃** at a constant level. More specifically, the voltage obtained by integration using a more extended integral time than that provided by the time constant of the normal control loop is latched in latch circuit **94**.

Latch circuit **94** may be a circuit for reading the value of the driving current (provided by transistor **80**) via an A/D converter, registering the read value and-outputting the registered value via a D/A converter.

FIG. **9** is a combination of FIGS. **6** and **8**. Referring now to FIG. **9**, the capacitance $C_{SWC}$ is switched by switching circuit **82** to cause the cut-off frequency $f_c$ to be shifted to a low-frequency zone, to thereby slow the filter response. Thereupon, latch circuit **94** controls the attenuation to the average level based on a monitored value.

More specifically, in FIG. **9**, switching of the control loop is made to occur after increasing the time constant of the normal control loop according to the control illustrated in FIG. **6**, so as to reduce an effect caused in the ALC characteristic as a result of the switching of the control loop.

As has been described above, monitor signal processing circuit **70** may receive a control signal for reporting completion of a variation in the number of channels after it receives

US 7,227,681 B2

**13**

a control signal for giving warning of a variation in the number of channels. Alternatively, however, monitor signal processing circuit **70** may not receive a control signal when the variation in the number of channels is complete. In this case, a timer (not illustrated) would be activated after the control signal for giving warning of a variation in the number of channels is extracted and identified.

The control signal cs**2** returns switching circuit **82** to the original frequency characteristic after the control signal for reporting a completion of a variation in the number of channels is received, or after a predetermined period of time has passed. Thereupon, the constant optical output control is resumed in accordance with the new reference voltage $V_{ref}$ set by reference voltage circuit **84**.

The control for maintaining the total optical output at a constant level that corresponds to the number of channels may be resumed in a gradual manner. For example, the output signal of photodiode (PD) **58**$_3$ may be input to operational amplifier **78** via a time constant circuit **96**, or reference voltage $V_{ref}$ may be gradually varied to assume a level that corresponds to the number of channels.

While the above-described arrangement ensures that the frequency characteristic is switched as a result of the control effected by switching circuit **82** so that the constant-level control of the optical output is frozen, it is also possible to hold the signal output by photodiode (PD) **58**$_3$ when the control signal for giving warning of a variation in the number of channels is extracted and identified. In this instance, the held value is input to operational amplifier **78** so that the constant-level control of the optical output is frozen. Other arrangements for freezing the constant-level control of the optical output are also possible. While it is assumed that the electrically-controlled optical device part is constructed using optical attenuator **64**, a semiconductor optical amplifier can be used instead of optical attenuator **64**. The semiconductor optical amplifier should have a small wavelength dependence. By controlling the semiconductor optical amplifier, the total optical output may be controlled at a constant level.

FIG. **10** is a diagram illustrating an optical amplifying apparatus, according to an additional embodiment of the present invention. Referring now to FIG. **10**, the optical amplifying apparatus includes first part **1000**, second part **2000** and a third part **3000**. Third part **3000** includes a rare-earth-doped optical fiber (EDF) **52**$_2$, an optical branching coupler **54**$_4$, an optical wavelength multiplexing coupler **56**$_2$, optical isolators **55**$_3$ and **55**$_4$, a photodiode (PD) **58**$_5$, a pump laser diode (LD) **59**$_2$ and an automatic gain control circuit (AGC) **60**$_2$. Third part **3000** also shares optical branching coupler **54**$_3$ and the photodiode (PD) **58**$_3$ with second part **2000**.

As with first part **1000**, third part **3000** controls an optical gain to be at a constant level. More specifically, second part **2000** controls the power level of the wavelength-multiplexed optical signal received by third part **3000** to be at a constant power level. As a result, the optical output power level of third part **3000** is also maintained at a constant power level. Even when the optical signal level is attenuated by optical attenuator **64** of second part **2000**, amplification provided by third part **3000** ensures that a desired total optical output is obtained.

Therefore, pump laser diode **59**$_1$ of first part **1000** and pump laser diode **59**$_2$ of third part **3000** can each have a relatively small capacity, thereby reducing the cost and stabilization of the amplifying apparatus.

Although FIG. **10** shows second part **2000** and third part **3000** sharing optical branching coupler **54**$_3$ and photodiode

**14**

(PD) **58**$_3$, it is also possible to provide a separate optical branching coupler and a separate photodiode in each of the second part **2000** and the third part **3000**.

Automatic gain control circuits **60**$_1$ and **60**$_2$ may have the same configuration. Moreover, the optical gains provided by first part **1000** and third part **3000** may be identical. Alternatively, the gains may be varied according to the characteristics of a transmission optical fiber used in third part **3000**.

In the event of a variation in the number of channels, the optical attenuation provided by optical attenuator **64** is frozen directly to monitor signal processing circuit **70**, or by monitor signal processing circuit **70** controlling automatic level control circuit **66**. Similar to the embodiment shown in FIG. **3**, it is ensured that a variation in the optical output in response to a variation in the number of channels is restricted so that non-linear degradation and S/N ratio degradation are reduced.

FIG. **11** is a diagram illustrating an optical amplifying apparatus, according to a further embodiment of the present invention. Referring now to FIG. **11**, the optical amplifying apparatus includes first part **1000**, second part **2000** and third part **3000**, which are the same as that show in FIG. **10**. However, the optical amplifying apparatus in FIG. **11** also includes an automatic level control (ALC) correction circuit **98** for controlling and correcting automatic level control circuit **66** of second part **2000**.

More specifically, a portion of the wavelength-multiplexed optical signal output by optical attenuator **64** is branched by optical branching coupler **54**$_3$, converted into an electrical signal by photodiode (PD) **58**$_3$ and input to automatic level control circuit **66**. Automatic level control circuit **66** controls optical attenuator **64** so that the total optical output power of the wavelength-multiplexed optical signal is maintained at a constant level. However, the optical output power of the output wavelength-multiplexed optical signal in third part **3000** is not fed to automatic level control circuit **66**. Therefore, it cannot be ensured that the total optical output in the third part **3000** is maintained within a predetermined range.

Accordingly, a portion of the output wavelength multiplexed optical signal in the third part **3000** is converted into an electrical signal by photodiode (PD) **58**$_5$ and input to ALC correction circuit **98** as well as to automatic gain control circuit **60**$_2$. ALC correction circuit **98** determines whether or not the total optical output power is maintained within the predetermined range. If the total optical output power is not within the predetermined range, ALC correction circuit **98** controls automatic level control circuit **66** which, in turn, controls optical attenuator **64** to maintain the total optical output power within the predetermined range. If a semiconductor optical amplifier is used in place of optical attenuator **64**, automatic level control circuit **66** controls the gain of the semiconductor optical amplifier so that the total optical output in third part **3000** is maintained within the predetermined level.

FIG. **12** is a diagram illustrating an optical amplifying apparatus, according to an embodiment of the present invention. The optical amplifying apparatus in FIG. **12** is a combination of the optical amplifying apparatuses in FIGS. **10** and **11**.

Referring now to FIG. **12**, in the event of a variation in the number of channels, monitor signal processing circuit **70** temporarily freezes the control effected by second part **2000** for controlling the optical output at a constant level, so that a variation in the optical output is reduced. Further, ALC correction circuit **98** controls automatic level control circuit

15

66 so as to maintain the total optical output power in third part **3000** within a predetermined range.

FIG. **13** is a diagram illustrating an optical amplifying apparatus, according to an additional embodiment of the present invention. The optical amplifying apparatus in FIG. **13** operates in a similar manner as previously described embodiments of the present invention, but also includes an optical branching coupler. **54**$_5$, a photodiode (PD) **58**$_6$, a dispersion compensation fiber (DCF) **100** and a dispersion compensation fiber (DCF) loss correction circuit **102**. Optical branching coupler **54**$_5$ and photodiode (PD) **58**$_6$ can be considered to be included in third part **3000**.

Dispersion compensation fiber **100** is connected between second part **2000** and third part **3000**. DCF loss correction circuit **102** controls automatic level control circuit **66**. In a long-distance, high-capacity, wavelength-multiplexing optical transmission system, dispersion compensation in relation to the dispersion level of the transmission optical fiber and the wavelength-multiplexed optical signal is necessary. For this reason, dispersion compensation fiber **100** is provided.

However, insertion loss due to a distribution compensation optical fiber can cause problems. More specifically, a variation in a loss due to the distribution compensation optical fiber causes a variation in the optical output of repeaters which include wavelength-multiplexed optical fiber amplifiers.

Therefore, by measuring a loss due to dispersion compensation fiber **100** and setting automatic level control circuit **66** so as to compensate for the loss, optical attenuator **64** is controlled to provide a constant optical output. The loss due to dispersion compensation optical fiber **100** is likely to vary depending on a level of dispersion compensation. Accordingly, even with the constant optical output control effected by automatic level control circuit **66**, the level of the wavelength-multiplexed optical signal input to third part **3000** may vary.

Therefore, a portion of the wavelength-multiplexed optical signal output by dispersion compensation optical fiber **100** and branched by optical branching coupler **54**$_5$ is converted into an electrical signal by photodiode (PD) **58**$_6$. The electrical signal is input to DCF loss correction circuit **102** as well as to automatic gain control circuit **60**$_2$. DCF loss correction circuit **102** determines whether or not the level of the wavelength-multiplexed optical signal output by dispersion compensation fiber **100** is within a predetermined range. If the level is outside the predetermined range, DCF loss correction circuit **102** supplies a correction signal to automatic level control circuit **66**. For example, the reference voltage (set voltage) for constant control of the optical output is corrected such that the optical output power is within the predetermined range. Therefore, a variation in insertion loss that results in a construction where dispersion compensation fiber **100** compensates for the dispersion in the transmission optical fiber is corrected, and a predetermined output level of the amplified wavelength-multiplexed optical signal is obtained.

FIG. **14** is a diagram illustrating an optical amplifying apparatus, according to an additional embodiment of the present invention. Referring now to FIG. **14**, when monitor signal processing circuit **70** extracts and identifies a control signal for giving warning of a variation in the number of channels, the operation of optical attenuator **64** is frozen (that is, the transmissivity or the attenuation is maintained to be constant), so that a rapid variation in the optical signal level is restricted. DCF loss correction circuit **102** controls automatic level control circuit **66** so as to correct a loss that varies depending on the level of dispersion compensation

16

provided by dispersion compensation fiber **100**. Thus, the level of the wavelength-multiplexed optical signal input to third part **3000** is maintained within a predetermined range.

FIG. **15** is a diagram illustrating an optical amplifying apparatus, according to a further embodiment of the present invention. Referring now to FIG. **15**, dispersion compensation fiber **100** compensates for dispersion in the transmission optical fiber, DCF loss correction circuit **102** corrects a variation in the loss depending on the level of compensation provided by dispersion compensation fiber **100**, and ALC correction circuit **98** controls automatic level control circuit **66** so as to maintain the level of the output wavelength-multiplexed optical signal in third part **3000** within a predetermined range. Thus, the wavelength-multiplexed optical signal in the wavelength-multiplexed optical transmission system is amplified, relayed and transmitted in a stable manner.

FIG. **16** is a diagram illustrating an optical amplifying apparatus, according to a still further embodiment of the present invention. Referring now to FIG. **16**, monitor signal processing circuit **70** controls optical attenuator **64** or automatic level control circuit **66** upon extracting and identifying a control signal for giving warning of a variation in the number of channels, so as to freeze constant-level control of the optical output. In this manner, a rapid variation in the level of the optical output is restricted.

Further, DCF loss correction circuit **102** controls automatic level control circuit **66** so as to correct a variation in the loss that depends on the level of dispersion provided by dispersion compensation optical fiber **100**. ALC correction circuit **98** controls automatic level control circuit **66** so as to maintain the output wavelength-multiplexed optical signal in third part **3000** within a predetermined range.

FIG. **17** is a diagram illustrating modification to the optical amplifying apparatus illustrated in FIG. **16**, according to an embodiment of the present invention. More specifically, in FIG. **17**, an optical filter A1 is provided between the output of optical isolator **55**$_2$ and optical branching coupler **54**$_2$, at the input of photodiode (PD) **58**$_5$. Also, an optical filter A2 is provided between the output of optical isolator **55**$_3$ and optical branching coupler **54**$_4$, at the input of photodiode (PD) **58**$_5$. Optical filters A1 and A2 are optical filters as disclosed, for example, in U.S. patent application Ser. No. 08/655,027, which is incorporated herein by reference, for correcting wavelength dependency of the gain.

FIG. **18**(A) is a graph illustrating gain versus wavelength characteristics of rare-earth-doped optical fiber (EDF) **52**$_2$ in FIG. **17**, FIG. **18**(B) is a graph illustrating the transmissivity versus wavelength of optical filter A2 in FIG. **17**, and FIG. **18**(C) is a graph illustrating overall gain of rare-earth-doped optical fiber (EDF) **52**$_2$ and optical filter A2 in FIG. **17**, according to an embodiment of the present invention.

If, for example, rare-earth-doped optical fiber (EDF) **52**$_2$ has a wavelength-dependent gain characteristic as shown in FIG. **18**(A), wherein the gain is higher in the long wavelength range, providing a gain correction optical filter A2 at the input of photodiode (PD) **58**$_5$ ensures that the amplifier has an even gain with respect to wavelength. Providing optical filter A2 ensures that photodiode (PD) **58**$_5$ receives the corrected multi-wavelength signal so that the unfavorable sensitivity characteristic, wherein the signal sensitivity is low in the short wavelength range and high in the long wavelength range, is corrected. Optical filters A1 and/or A2 may or may not be provided, depending on the use of rare-earth-doped optical fibers (EDF) **52**$_1$ and **52**$_2$.

FIG. **19** is a diagram illustrating an optical amplifying apparatus, according to an embodiment of the present inven-

US 7,227,681 B2

17

tion. Referring now to FIG. **19**, the positioning of the first part **1000** and the second part **2000** are essentially switched. Therefore, a wavelength-multiplexed optical signal is controlled to have a constant power level by second part **2000**, and is then controlled by first part **1000** to have a constant gain.

More specifically, an input wavelength-multiplexed optical signal is transmitted to optical attenuator **64**. The wavelength-multiplexed optical signal output from optical attenuator **64** is transmitted to rare-earth-doped optical fiber **52**$_1$ via optical isolator **55**$_1$ and optical wavelength multiplexing coupler **56**$_1$. The amplified wavelength-multiplexed optical signal is output via optical isolator **55**$_2$ and optical branching coupler **54**$_2$.

A portion of the wavelength-multiplexed optical signal branched by optical branching coupler **54**$_1$ is converted into an electrical signal by photodiode **58**$_1$ and fed to automatic level control circuit **66** and automatic gain control circuit **60**$_1$. Automatic level control circuit **66** controls the optical attenuation provided by optical attenuator **64** so that the wavelength-multiplexed optical signal has its level controlled to be within a predetermined range and is then transmitted to first part **1000**.

A portion of the wavelength-multiplexed optical signal branched by optical branching coupler **54**$_2$ is converted into an electrical signal by photodiode **58**$_2$ and transmitted to automatic gain control circuit **60**$_1$. Automatic gain control circuit **60**$_1$ controls pump laser diode **59**$_1$ so that a ratio between a level of the wavelength-multiplexed optical signal input to, and output from, rare-earth-doped optical fiber **52**$_1$ is maintained at a constant level.

Therefore, second part **2000** causes the power level of the wavelength-multiplexed optical signal to be constant even when a signal input via a transmission optical fiber varies greatly. As a result, a wavelength-multiplexed optical signal having a constant level is input to first part **1000**. Accordingly, automatic gain control circuit **60**$_1$ may have a small control zone and a relatively simple construction. Further, since the power level of the optical signal input to rare-earth-doped optical fiber **52**$_1$ is prevented from exceeding a predetermined level, it is not necessary to raise the level of the pump laser beam supplied by pump laser diode **59**$_1$. That is, pump laser diode **59**$_1$ may have a small capacity.

FIG. **20** is a diagram illustrating an optical amplifying apparatus, according to an additional embodiment of the present invention. The optical amplifying apparatus illustrated in FIG. **20** is similar to the optical amplifying apparatus in FIG. **19**, but also includes optical branching coupler **54**$_3$, photodiode (PD) **58**$_3$ and monitor signal processing circuit **70**.

Referring now to FIG. **20**, a wavelength-multiplexed optical signal supplied via a transmission optical fiber is input to variable optical attenuator **64** and has a portion branched by optical branching coupler **54**$_3$, converted into an electrical signal by photodiode **58**$_3$ and input to monitor signal processing circuit **70**.

A control signal for giving warning of a variation in the number of channels may be superimposed on the wavelength-multiplexed optical signal by amplitude modulation or transmitted on a dedicated control channel. Upon extracting and identifying the control signal for giving warning of a variation in the number of channels, monitor signal processing circuit **70** controls automatic level control circuit **66** and retains the optical attenuation provided by optical attenuator **64** at the current level (thereby freezing the operation of optical attenuator **64**) so that the optical output power is no longer maintained at a constant level.

18

When the change in the number of channels is completed, monitor signal processing circuit **70** allows optical attenuator **64** to resume its control for maintaining the optical output power at a constant level. With this arrangement, it is possible to reduce or eliminate a rapid variation in the power level of the optical signal.

FIG. **21** is a diagram illustrating an optical amplifying apparatus, according to a further embodiment of the present invention. The optical amplifying apparatus illustrated in FIG. **21** is similar to the optical amplifying apparatus in FIG. **19**, but includes ALC correction circuit **98**.

ALC correction circuit **98** determines whether or not the power level of the output wavelength-multiplexed optical signal is within a predetermined range. If the power level is not within the predetermined range, ALC correction circuit **98** controls automatic level control circuit **66** so that the optical attenuation provided by optical attenuator **64** causes the output wavelength-multiplexed optical signal to have a power level within a predetermined range.

FIG. **22** is a diagram illustrating an optical amplifying apparatus, according to a still further embodiment of the present invention. The optical amplifying apparatus illustrated in FIG. **22** is a combination of the optical amplifying apparatuses illustrated in FIGS. **20** and **21**.

Referring now to FIG. **22**, ALC correction circuit **98** controls automatic level control circuit **66** so that the power level of the output wavelength-multiplexed optical signal is within a predetermined range. Upon extracting and identifying a control signal for giving warning of a variation in the number of channels, monitor signal processing circuit **70** freezes the automatic level control function so that the optical output power is not longer maintained at a constant level.

FIG. **23** is a diagram illustrating an optical amplifying apparatus, according to an embodiment of the present invention. Referring now to FIG. **23**, instead of controlling (freezing) the optical attenuator **64** so as to provide a constant attenuation when the number of channels is varied, the optical amplifier as a whole is changed to the AGC mode when the number of channels is varied. Such a change can be achieved by controlling the ratio between the input to, and the output from, optical attenuator **64**, to be at a constant level. Such an operation is tantamount to maintaining the gain G ($0 \le G \le 1$) of optical attenuator **64** or the light transmissivity of optical attenuator **64** at a constant level.

Therefore, in FIG. **23**, a switch **104** is controlled by monitor signal processing circuit **70** to switch between automatic level control provided by automatic level control circuit **66** and automatic gain control provided by an automatic gain control circuit **60**$_3$. More specifically, for example, as illustrated in FIG. **4**(A), monitor signal processing circuit **70** causes switch **104** to select automatic level control circuit **66** prior to, and subsequent to, a variation in the number of channels. While the number of channels is being varied, monitor signal processing circuit **70** causes switch **104** to select automatic gain control circuit **60**$_3$.

FIG. **23** also illustrates a laser diode (LD) **105** which is controlled by monitor signal processing circuit **70** to transmit information to downstream optical components, such as downstream optical repeaters. For example, as described in more detail further below, laser diode (LD) **105** can be used by monitor signal processing circuit **70** to transmit information to downstream optical components.

FIG. **24** is a more detailed diagram of the optical amplifying apparatus in FIG. **23**. Referring now to FIG. **24**, the operation is as follows:

US 7,227,681 B2

19

(1) Normally (that is, when the number of channels are not being varied), switch **104** selects automatic level control circuit **66** so that the power level of light output from optical attenuator **64** is monitored and maintained at a constant level.

(2) When monitor signal processing circuit **70** receives a signal warning of a change in the number of channels, a gain monitoring signal **107** of automatic gain control circuit **60₃** is read so that an average gain (attenuation) with respect to a time constant on the order of 10–100 ms is determined.

(3) A reference voltage $V_{AGC}$ corresponding to the average gain determined in (2) is output from monitor signal processing circuit **70** to automatic gain control circuit **60₃**.

(4) Switch **104** then selects automatic gain control circuit **60₃**.

(5) Monitor signal processing circuit **70** receives information indicating the new number of channels to be included in the wavelength-multiplexed optical signal.

(6) Monitors signal processing circuit **70** provides to automatic level control circuit **66** a reference voltage $V_{ALC}$ corresponding to the new number of channels.

(7) Monitor signal processing circuit **70** receives a signal indicating that the variation in the number of channels is complete. Alternatively, a predetermined period of time lapses from the receipt of the signal warning of the change in the number of channels.

(8) Switch **104** selects automatic level control circuit **66**.

The relationship between an attenuation provided by optical attenuator **64** and a driving current of control element **86** provided by transistor **80** may depend on a parameter such as an operating temperature, but is generally a one-to-one relationship. Therefore, (2), above, may be replaced by a process whereby the driving current is monitored (with respect to the time constant on the order of 10–100 ms) so as to determine an average gain (attenuation) based on the monitored driving current. The driving current may be controlled so that its average level is maintained constant.

FIG. **25** is a diagram illustrating a fiber optical communication system employing an optical amplifying apparatus according to embodiments of the present invention. Referring now to FIG. **25**, a transmitter (Tx) **108** transmits an SV light beam to a receiver (Rx) **110**, where an SV light beam is light that is wavelength-multiplexed with a main signal. The main signal is used to transmit information downstream. An optical amplifier (O-AMP) **112** amplifies the SV light beam. Main signal control **114** and monitor signal processing **116** are performed.

FIG. **26** is a more detailed diagram illustrating an optical amplifying apparatus which includes optical amplifier **112**, main signal control **114** and monitor signal processing **116** of FIG. **25**. The optical amplifying apparatus in FIG. **26** is similar to the optical amplifying apparatus in FIG. **3**, but includes laser diode (LD) **105** for sending an SV light beam downstream.

More specifically, monitor signal processing circuit **70** inserts, in the SV light beam, information indicating when the attenuation, or light transmissivity, of the optical attenuator **64** will be held constant, or "frozen". The SV light beam, carrying that information, is transmitted by laser diode (LD) **105** to the transmission line.

FIG. **27** is a diagram illustrating a transmission line employing a plurality of optical amplifying apparatuses, according to embodiments of the present invention. Referring now to FIG. **27**, a wavelength-multiplexed optical communication system includes transmitters Tx **120**, wavelength-multiplexed optical fiber amplifiers/repeaters OAMPs **122** and receivers Rx **124**. When a variation in the

20

number of channels is processed, all the OAMPs **122** in the upstream (or downstream) line in the system are set into a constant optical gain control.

A wavelength-multiplexed optical postamplifier (not illustrated) that may be provided in each transmitter Tx **120** and a wavelength-multiplexed optical preamplifier (not illustrated) that may be provided in each receiver Rx **124** are also set into a constant gain control. When all OAMPS **122** are in a constant gain control state, the power of an optical signal fed to a light receiving element in receivers Rx **124** may vary.

In a transmission line having optical amplifying apparatuses as illustrated in FIG. **25**–**27**, it is possible to determine whether or not all the optical fiber amplifiers in the path managed by a receiving end (Rx) on the transmission line have their attenuation fixed and their optical gain maintained at a constant level. Once it is determined that all the optical fiber amplifiers have their optical gain maintained at a constant level, information indicating the same is sent to the transmitting end (Tx) via the backward path, whereupon a variation in the number of channels can be started.

The following is an example of the operation flow in a transmission line having optical amplifying apparatuses as illustrated in FIGS. **25**–**27**, for processing a variation in the number of channels.

(1) A signal warning of a variation in the number of channels is issued from the upstream SV transmitting end (SVTx).

(2) Monitor signal processing circuit **70** of each OAMP receives the signal warning of the variation in the number of channels.

(3) Each OAMP starts "freezing" the operation of the associated optical attenuator.

(4) Each OAMP completes a freezing operation of the associated optical attenuator and sends downstream information indicating that the constant optical gain control is started by carrying that information on the monitor signal (an identification number for identifying the individual OAMPs is also inserted on the monitor signal).

(5) The upstream SV receiving end (SVRx) acknowledges that all of the upstream OAMPS are in the constant optical gain state.

(6) The downstream SV transmitting end (SVTx) announces that all the upstream OAMPs are in the constant optical gain state.

(7) The downstream SV receiving end (SVRx) acknowledges that all the upstream OAMPS are in the constant optical gain state.

(8) The upstream transmitting end (Tx) actually varies the number of channels.

(9) The upstream SV transmitting end (SVTx) issues information indicating that the variation in the number of channels is completed.

(10) The monitor signal processing circuit **70** in each OAMP receives the information indicating that the variation in the number of channels is completed.

(11) Each OAMP cancels the freezing operation for freezing the operation of the associated optical attenuator and proceeds to the constant optical output control.

(12) Each OAMP sends downstream information indicating that a shift to the constant optical output control is completed, in the form of the monitor signal (an identification signal identifying the individual-OAMPs is also sent).

(13) The upstream SV receiving end (SVRx) receives the information indicating that all the OAMPs have processed the variation in the number of channels.

US 7,227,681 B2

21

(14) The information indicating that all of the OAMPs have processed the variation in the number of channels is sent to the transmitting end.

FIG. **28** is a timing diagram illustrating the above-described operation flow.

Therefore, in the processing of the variation in the number of channels, a wavelength-multiplexed optical fiber amplifier is temporarily stopped from performing an automatic level control function and, instead, is made to perform a constant gain control function, or to cause the optical amplifying apparatus, as a whole, to perform a constant gain function.

However, in an optical communication system, it is usually necessary to maintain the power of an optical signal supplied to a light receiving element at a constant level. Although a variation in the input power due to polarization variation occurs under conventional circumstances, the control for maintaining the optical gain of the optical fiber amplifier at a constant level causes the power of the optical signal supplied to the light receiving element to vary.

This problem can be overcome by demultiplexing the optical signal into individual channels, and controlling the power level of the individual demultiplexed channels.

More specifically, FIG. **29** is a diagram illustrating a portion of an optical communication system, according to an embodiment of the present invention. Referring now to FIG. **29**, a demultiplexer (DEMUX) **125** demultiplexes a wavelength-multiplexed optical signal into individual channels to be received by individual receivers **126**. An optical preamplifier **127** and an automatic level control unit **128** is provided for each channel, so that the associated receiver **126** receives an optical signal at a constant power level.

According to the above embodiments of the present invention, an optical attenuator or an optical amplifier can be controlled to provide a constant gain while the number of channels in a wavelength-multiplexed optical signal are being varied. In this case, the gain G can be in the range (0≦G≦1). Thus, an optical attenuator can be controlled to provide a constant gain by maintaining a constant ratio between the input and the output of the optical attenuator.

According to the above embodiments of the present invention, a rare-earth doped optical fiber used in an optical amplifier, where the dopant is erbium (Er). However, the present invention is not intended to be limited to an erbium (Er) doped optical fiber. Instead, other rare-earth-doped optical fibers, such as a neodymium(Nd)-doped optical fiber or a praseodymium(Pd)-doped optical fiber, may also be used, depending on the wavelength involved. Further, for example, the various photodiodes disclosed herein can be replaced by phototransistors.

According to the above embodiments of the present invention, specific embodiments of automatic gain control circuits and automatic level control circuits are disclosed. However, the present invention is not intended to be limited to any specific circuit configuration for these circuits, or for other circuits disclosed herein. Instead, many different circuit configuration can be used.

Moreover, according to the above embodiments of the present invention, an optical attenuation is used to provide a variable attenuation. There are many different types of known optical attenuators, and the embodiments of the present invention are not intended to be limited to any specific type of optical attenuator.

Although a few preferred embodiments of the present invention have been shown and described, it would be appreciated by those skilled in the art that changes may be made in these embodiments without departing from the

22

principles and spirit of the invention, the scope of which is defined in the claims and their equivalents.

The invention claimed is:

**1**. An optical transmission system comprising:

a transmitting terminal transmitting a wavelength division multiplexed (WDM) optical signal having a variable number of channels associated with different wavelengths; and

an optical amplifier which amplifies the WDM optical signal from the transmitting terminal with a gain and outputs the amplified WDM optical signal, the optical amplifier including:

an optical attenuator which controls a level of the amplified WDM optical signal,

an optical filter which makes the gain substantially even with respect to said different wavelengths, and

a controller which controls the gain to be approximately constant.

**2**. An optical transmission system as in claim **1**, wherein the controller controls the gain to be approximately constant during variation of the number of channels in the WDM optical signal.

**3**. An optical transmission system as in claim **1**, wherein the optical amplifier comprises:

a first stage optical amplifier which amplifies the WDM optical signal; and

a second stage optical amplifier which amplifies the first stage amplified WDM optical signal.

**4**. An optical transmission system as in claim **1**, wherein an attenuation level of the optical attenuator is changed to control the level of the amplified WDM optical signal.

**5**. An optical transmission system as in claim **3**, wherein the optical attenuator is positioned between the first stage optical amplifier and the second stage optical amplifier.

**6**. An apparatus comprising:

an optical amplifier which amplifies a wavelength division multiplexed (WDM) optical signal having a variable number of channels associated with different wavelengths with a gain and outputs the amplified WDM optical signal, the optical amplifier including:

an optical attenuator which controls a level of the amplified WDM optical signal,

an optical filter makes the gain substantially even with respect to said different wavelengths, and

a controller which controls the gain to be approximately constant.

**7**. An apparatus as in claim **6**, wherein the controller controls the gain to be approximately constant during variation of the number of channels in the WDM optical.

**8**. An apparatus as in claim **6**, wherein an attenuation level of the optical attenuator is changed to control the level of the amplified WDM optical signal.

**9**. An optical transmission system comprising:

a transmitting terminal transmitting a wavelength division multiplexed (WDM) optical signal having a variable number of channels associated with different wavelengths;

an optical amplifier which amplifies the WDM optical signal from the transmitting terminal with a gain and outputs the amplified WDM optical signal, the optical amplifier including:

an optical attenuator which controls a level of the amplified WDM optical signal,

an optical filter making the gain substantial even with respect to said different wavelengths, and

a controller which controls the gain to be approximately constant; and

US 7,227,681 B2

23

a receiving terminal receiving the amplified WDM optical signal from the optical amplifier.

**10**. An optical transmission system as in claim **9**, wherein the controller controls the gain to be approximately constant during variation of the number of channels in the WDM optical signal.

**11**. An optical transmission system as in claim **9**, wherein the optical amplifier comprises:

a first stage optical amplifier which amplifies the WDM optical signal; and

a second stage optical amplifier which amplifies the first stage amplified WDM optical signal.

**12**. An optical transmission system as in claim **9**, wherein an attenuation level of the optical attenuator is changed to control the level of the amplified WDM optical signal.

**13**. An optical transmission system as in claim **11**, wherein the optical attenuator is positioned between the first stage optical amplifier and the second stage optical amplifier.

**14**. An apparatus comprising:

an optical amplifier which amplifier a wavelength division multiplexed (WDM) optical signal having a variable number of channels associated with different wave-

24

lengths with a gain and outputs the amplified WDM optical signal, the optical amplifier including:

a first stage optical amplifier which amplifies the WDM optical signal and outputs the first stage amplified optical signal,

an optical attenuator which controls a level of the first stage amplified WDM optical signal and outputs the controlled WDM optical signal,

an optical filter making the gain substantially flat with respect to said different wavelengths,

a second stage optical amplifier which amplifies the controlled WDM optical signal and outputs the amplified, controlled WDM optical signal, and

a controller which controls the gain to be approximately constant.

**15**. An apparatus as in claim **14**, wherein the controller controls the gain to be approximately constant during variation of the number of channels in the WDM optical signal.

**16**. An apparatus as in claim **14**, wherein an attenuation level of the optical attenuator is changed to control the level of the amplified WDM optical signal.

\*    \*    \*    \*    \*

# CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2013, I caused a true and correct copy of the Opening Brief of Appellants Tellabs Operations, Inc., Tellabs, Inc., and Tellabs North America, Inc. to be served via electronic mail on the following counsel for Fujitsu Limited and Fujitsu Network Communications, Inc.:

James C. Brooks
Orrick, Herrington & Sutcliffe LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Email: jbrooks@orrick.com

David C. Van Dyke
Howard & Howard
200 South Michigan Ave.
Suite 1100
Chicago, IL 60604
Email: dvd@h2law.com

David E. Wang
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
Email: dwang@orrick.com

/s/ Kelley A. Conaty
Kelley A. Conaty

## CERTIFICATE OF COMPLIANCE WITH
## FED. R. APP. P. 32(a)(7)

Counsel for Tellabs Operations, Inc., Tellabs, Inc., and Tellabs North America, Inc. certify that the body of this brief, beginning with the "Jurisdictional Statement" on page 1 and ending with the last line of the "Conclusion" on page 67, contains 13,916 words, as measured by the word-processing system used to prepare this brief, in compliance with Rule 32(a)(7) of the Federal Rules of Appellate Procedure.

/s/ Constantine L. Trela, Jr.
Constantine L. Trela, Jr.
Counsel for Tellabs Operations, Inc., Tellabs, Inc.,
and Tellabs North America, Inc.

DA1 706629v.1